Clifton **GREGORY**, Appellant,

v.

**UNITED STATES** of America,
Appellee.

No. 19599.

United States Court of Appeals
District of Columbia Circuit.

Argued Feb. 21, 1966.

Decided July 28, 1966.

Mr. John A. Shorter, Jr., Washington, D. C., for appellant.

Mr. Charles L. Owen, Asst. U. S. Atty., with whom Messrs. David G. Bress, U. S. Atty., and Frank Q. Nebeker and William C. Weitzel, Jr., Asst. U. S. Attys., were on the brief, for appellee.

Before BAZELON, Chief Judge, and DANAHER and WRIGHT, Circuit Judges.

J. SKELLY WRIGHT, Circuit Judge:

The indictment against appellant charges five counts—first degree murder,[1] second degree murder,[2] two robberies,[3] and one assault with a dangerous weapon.[4] After his motion for severance was denied, appellant was tried and convicted on all counts. We reverse for severance and a new trial.

The indictment covers two separate series of events, both including liquor store robberies. As to the first robbery, the Government relied for identification of the defendant on only one witness, and that witness on the day after the robbery had identified someone other

1. 22 D.C.CODE § 2401 (1961).
2. 22 D.C.CODE § 2403 (1961).
3. 22 D.C.CODE § 2901 (1961).
4. 22 D.C.CODE § 502 (1961).

than appellant as the robber. A second witness to the robbery testified that appellant was "definitely not the [robber]." The Government's evidence as to appellant's participation in the second robbery, which resulted in the murder of the operator of the liquor store, consisted of three witnesses who identified appellant as the robber, while a fourth testified he was not the man. The primary issue presented to the jury as to all counts was identification, the fact of the robberies, the assault and the murder being uncontested.

While we have considered the many allegations of error made by counsel for appellant, this being a first degree murder case we have also made our own study of the record.[5] Since the weight of the errors disclosed by the record compels reversal, we shall consider only the principal ones without weighing the effect of each on the outcome of the trial.

I

The prosecutor embarrassed and confounded the accused in the preparation of his defense by advising the witnesses to the robberies and murder not to speak to anyone unless he were present. Six days before the trial began, defense counsel and the prosecutor, Mr. Weitzel, appeared before a motions judge. Defense counsel asked for the judge's assistance because two eye witnesses to the murder and robbery had declined "to talk to me unless Mr. Weitzel is present or unless Mr. Weitzel authorizes him to talk to me." Defense counsel asked the judge to direct Mr. Weitzel to allow the witnesses to talk to him. The court ruled: "I can't direct the Government to permit you to talk to a Government witness."

On the day the trial opened, defense counsel asked for the assistance of the trial judge with respect to his difficulty in interviewing the witnesses to the events on trial. Defense counsel stated to the court that the witnesses had refused to talk to him because "the United States Attorney told them not to talk to us." At this point the prosecutor, Mr. Weitzel, stated: "I instructed all the witnesses that they were free to speak to anyone they like. However, it was my advice that they not speak to anyone about the case unless I was present." Mr. Weitzel further advised the trial court that defense counsel's motion had already been denied by a motions judge, whereupon the trial court stated: "Well, I think that disposes of the matter."

After the prosecutor had completed his opening statement, defense counsel called to the court's attention the fact that, according to the opening statement, several witnesses on the list of witnesses provided defense counsel as required by 18 U.S.C. § 3432 would not be called by the Government. Apparently thinking that if the Government had no use for these witnesses he might have, defense counsel again pointed out that he had not been able to interview these witnesses because "they have been told not to talk to us," and asked the court's assistance at least with reference to interviewing the witnesses on the list the Government would not use. The court stated: "There is nothing I can do about it."

 The purpose of 18 U.S.C. § 3432 requiring that in capital cases the defendant be furnished a list of the names and addresses of the witnesses to be called by the Government is to assist defense counsel in preparing the

5. "It has always been the custom of this court 'in cases of serious criminal offenses, to check carefully the record for error prejudicial to defendant which he did not urge,' either at the trial or in this court. See Williams v. United States, 1942, 76 U.S.App.D.C. 299, 300, 131 F.2d 21, 22; Tatum v. United States, 1951, 88 U.S.App.D.C. 386, 388, 190 F.2d 612, 614, and cases there cited. * * *" Lampe v. United States, 110 U.S.App.D.C. 69, 70, 288 F.2d 881, 882 (1961), cert. denied, 368 U.S. 958, 82 S.Ct. 400, 7 L.Ed. 2d 389 (1962).

defense by interviewing the witnesses.[6] Witnesses, particularly eye witnesses, to a crime are the property of neither the prosecution nor the defense. Both sides have an equal right, and should have an equal opportunity, to interview them. Here the defendant was denied that opportunity which, not only the statute, but elemental fairness and due process required that he have. It is true that the prosecutor stated he did not instruct the witnesses not to talk to defense counsel. He did admit that he advised the witnesses not to talk to anyone unless he, the prosecutor, were present.

■ We accept the prosecutor's statement as to his advice to the witnesses as true. But we know of nothing in the law which gives the prosecutor the right to interfere with the preparation of the defense by effectively denying defense counsel access to the witnesses except in his presence. Presumably the prosecutor, in interviewing the witnesses, was unencumbered by the presence of defense counsel, and there seems to be no reason why defense counsel should not have an equal opportunity to determine, through interviews with the witnesses, what they know about the case and what they will testify to. In fact, Canon 39 of the Canons of Professional Ethics makes explicit the propriety of such conduct: "A lawyer may properly interview any witness or prospective witness for the opposing side in any civil or criminal action without the consent of opposing counsel or party." Canon 10 of the Code of Trial Conduct of the American College of Trial Lawyers is an almost verbatim provision.

■ We do not, of course, impugn the motives of the prosecutor in giving his advice to the witnesses. Tampering with witnesses and subornation of per-

jury are real dangers, especially in a capital case. But there are ways to avert this danger without denying defense counsel access to eye witnesses to the events in suit unless the prosecutor is present to monitor the interview. We cannot indulge the assumption that this tactic on the part of the prosecution is necessary. Defense counsel are officers of the court. And defense counsel are not exempted from prosecution under the statutes denouncing the crimes of obstruction of justice and subornation of perjury. In fact, the Government's motivation in disallowing defense counsel to interview witnesses apparently stems from factors other than fear of tampering. Recent records in this court reveal that the same policy followed in this case is followed even when the witness involved is a member of the police force. See Holmes v. United States, 125 U.S.App.D.C. ——, 370 F.2d 209 (No. 19, 519, decided July 21, 1966), Tr. pp. 138–139.

■ A criminal trial, like its civil counterpart, is a quest for truth. That quest will more often be successful if both sides have an equal opportunity to interview the persons who have the information from which the truth may be determined. The current tendency in the criminal law is in the direction of discovery of the facts before trial and elimination of surprise at trial.[7] A related development in the criminal law is the requirement that the prosecution not frustrate the defense in the preparation of its case. Information favorable to the defense must be made available to the defense. Brady v. State of Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed. 2d 215 (1963). Reversals of convictions for suppression of such evidence, and even for mere failure to disclose, have

---

6. See United States v. Soblen, S.D.N.Y., 203 F.Supp. 542 and cases cited at 552 (1961), *affirmed*, 2 Cir., 301 F.2d 236, *cert. denied*, 370 U.S. 944, 82 S.Ct. 1585, 8 L.Ed.2d 810 (1962).

7. See Rule 16, FED.R.CRIM.P., particularly the amendments thereto which became

effective July 1, 1966. See also Traynor, *Ground Lost and Found in Criminal Discovery*, 39 N.Y.U.L.REV. 228 (1964); Brennan, *The Criminal Prosecution: Sporting Event or Quest for Truth*, 1963 WASH.U.L.Q. 279.

# 189

become commonplace.[8] It is not suggested here that there was any direct suppression of evidence. But there was unquestionably a suppression of the means by which the defense could obtain evidence. The defense could not know what the eye witnesses to the events in suit were to testify to or how firm they were in their testimony unless defense counsel was provided a fair opportunity for interview. In our judgment the prosecutor's advice to these eye witnesses frustrated that effort and denied appellant a fair trial.

## II

The appellant's motion for severance at the opening of trial should have been granted. The court denied the motion because it "comes too late." We think this is an inadequate reason for denying a motion for severance in a capital case. It may be seriously questioned whether it is proper in any capital case to join for trial offenses occurring at different times and places. The danger arising from the cumulative effect of evidence of other offenses on the minds of the jurors is too great to tolerate in such cases.

Moreover, even if one of the robberies in suit had not resulted in homicide, Drew v. United States [9] would have required a severance. In Drew the indictment charged a robbery at one High's Ice Cream Store, and an attempted robbery at another, on different days. In reversing the convictions as to both for failure to grant a severance, the court in Drew first pointed to the familiar principle that ordinarily in criminal trials evidence of other crimes is inadmissible since such evidence tends to prove disposition on the part of the defendant to commit crime generally rather than guilt of the specific crime for which the defendant is on trial. 118 U.S.App. D.C. at 15, 331 F.2d at 89. Drew then showed that where evidence of more than one crime is offered to the jury because more than one crime is charged in the indictment, the evidence as to all crimes charged tends to cumulate to prove each, thus prejudicing the defendant in his right to a separate consideration of his guilt or innocence on each charge. 118 U.S.App.D.C. at 17, 331 F.2d at 91.

■■ There is no question here as to whether the joinder of the various counts in one indictment was permissible under Rule 8(a), FED.R.CRIM.P. It was. The point is that a severance should have been granted because, for trial purposes, the joinder was prejudicial under Rule 14, FED.R.CRIM.P. Here there was not only the danger of the evidence with respect to the two robberies cumulating in the jurors' minds tending to prove the defendant guilty of each, but the evidence as to one of the robberies was so weak as to lead one to question its sufficiency to go to the jury. Thus its primary usefulness in this trial was to support the Government's case as to the robbery which resulted in the murder.

## III

■ A prosecution witness, Police Officer Johnson, on two occasions volunteered testimony concerning an offense, for which appellant was under indictment in another case, totally unrelated to the crimes for which appellant was on trial. The police officer was called in rebuttal by the Government to testify that three weeks before the events in suit appellant was clean shaven, several of appellant's witnesses, including himself and his barber, having testified that for some months prior to the robbery appellant had been wearing a goatee. The prosecutor had previously assured the court and defense counsel that the Government would not develop the evidence that at time the officer saw appellant clean shaven, appellant had assaulted him with a gun.

8. See Note, The Duty of the Prosecutor to Disclose Exculpatory Evidence, 60 COLUM.L.REV. 858 (1960); Comment, Prosecutor Held to Have Duty to Disclose Material Exculpatory Evidence Without Prior Defense Request, 39 N.Y.U.L.REV. 565 (1964).

9. 118 U.S.App.D.C. 11, 331 F.2d 85 (1964).

On direct examination of the police officer, no reference to the assault with the gun was made. On cross, however, when the officer began a non-responsive answer to a question, defense counsel objected, fearing that he might voluntarily introduce the gun incident. The trial court overruled the objection and ordered the witness to finish his answer. In finishing his answer, later held non-responsive by the court, the officer testified to the assault with a gun. Whereupon defense counsel moved for a mistrial. The motion was denied with the simple instruction that the jury should disregard the answer. The motion for the mistrial and the instruction[10] to the jury to disregard the witness' testimony with reference to the gun incident were made in the presence of the officer on the witness stand. Five questions later, in the same cross-examination, the officer again volunteered the testimony that appellant had assaulted him with a gun. Again there was a motion for a mistrial, which was again denied with a perfunctory instruction[11] to the jury to disregard the testimony.

With reference to the effectiveness of the court's cautionary instruction to the jury to disregard the improper testimony, particularly the instructions given in this case, it may be useful to quote again from Mr. Justice Jackson, concurring, in Krulewitch v. United States, 336 U.S. 440, 453, 69 S.Ct. 716, 723, 93 L.Ed. 790 (1949): "The naive assumption that prejudicial effects can be overcome by instructions to the jury * * * all practicing lawyers know to be unmitigated fiction." The volunteering by police officers of inadmissible testimony prejudicial to the defendant has been condemned time and again by both state and federal courts. For example, in Wright v. State, Okl.Cr.App., 325 P.2d 1089, 1093 (1958), where a law enforcement officer injected this type of prejudicial testimony, not twice as here, but

only once, the court stated: "This type of testimony has often been referred to as an 'evidential harpoon' that has been wilfully jabbed into the defendant and then jerked out by an admonition to the jury not to consider the same. This court has never condoned, but often criticized a witness being intoxicated with eagerness in an all out effort to obtain a conviction. ∴ * * Officers must be aware that an overzealous attitude is, in most instances, detrimental to the prosecution and often results in a retrial of the case at considerable expense to the state."

## IV

The instructions to the jury in this case were deficient. In spite of the fact that the only real issue presented by the evidence was the identification of the defendant, no charge on identification was given. As to both robberies, there was a division among the eye witnesses as to whether or not the defendant on trial was the bandit. Yet the jury's attention was not focused on the fact that it not only had to find beyond a reasonable doubt that the crimes had been committed as charged before the defendant could be convicted, but also that beyond a reasonable doubt it was the defendant on trial who had committed them.

Without doubt, conviction of the wrong man is the greatest single injustice that can arise out of our system of criminal law. The fear that a completely innocent man may be executed or sent to the penitentiary constantly haunts not only those of us concerned with the law, but sensitive people generally. Thus the obligation to guard against this danger is obvious. An identification instruction alone will not, of course, obviate the danger. But at least it is a step in the right direction. That step should have been taken in this case. See Jones v. United States,

---

10. The court instructed the jury: "This answer is not responsive to the question and it will be stricken and the jury is instructed to disregard it."

11. The court instructed the jury: "The answer will be stricken and the jury instructed to disregard it."

124 U.S.App.D.C. 83, 361 F.2d 537 (1966); Salley v. United States, 122 U.S. App.D.C. 359, 353 F.2d 897 (1965).

## V

The court required defense counsel to request, receive and read the Jencks Act [12] statements in the presence of the jury. After the close of the direct testimony of the first Government witness, defense counsel was permitted to approach the bench, where he asked the prosecution for any Jencks Act statements relating to the witness. He was immediately advised that the request would have to be made in open court in the presence of the jury. Defense counsel protested that this court just one week before had handed down its opinion in Johnson v. United States, 121 U.S. App.D.C. 19, 22, 347 F.2d 803, 806 (1965), wherein we stated:

> "Moreover, in order to avoid the undue prejudice which may arise from the jury's knowledge that Jencks Act statements were available to the accused, motions for their production should be made outside the hearing of the jury. The actual handing over of the statements should take place with the jury absent, or at least unaware. In this case, for example, the statements apparently were turned over to defense counsel in the presence of the jury and then a recess was called to permit counsel to study the statements. No reason appears why the recess could not have been called first and the statements transferred after the jury had left. Thus the risk of strengthening the Government's case in moving for production of Jencks Act statements is avoided. In this way full recognition is accorded the rights of the defendant under the Jencks decision as reaffirmed by Congress in the Jencks Act." (Footnotes omitted.)

The trial judge indicated that he was familiar with the Johnson case, but that he would not follow the procedure there indicated because in his judgment it was dictum. Thereafter, and over the protest of defense counsel, as to each witness defense counsel was required to go through the ritual of asking for, receiving and reading the Jencks Act statements in the presence of the jury.

 Our purpose in Johnson in requiring that opportunity be provided to defense counsel to request and receive Jencks Act statements outside the presence of the jury is to preclude the jury from drawing an inference that the statement or statements received are consistent with the witness' testimony unless defense counsel uses the statements to cross-examine him. It is familiar law that prior consistent statements are not admissible in evidence,[13] and consequently it is improper to require a procedure, in exercising Jencks Act rights, which may permit the inference that the prior statements received are consistent with the witness' testimony on trial. We perceive no reason, other than to prejudice the defendant in the exercise of his Jencks Act rights, to require defense counsel to request and receive Jencks Act statements in the presence of the jury. Compare Williams v. United States, 117 U.S.App.D.C. 206, 209, 328 F.2d 178, 181 (1963), and cases cited therein.

## VI

During the trial of this case, the witnesses were segregated. No instruction, however, was given the witnesses, before they were placed in the witness room, that they were not to discuss the case among themselves or with anyone except counsel for either side. As a result, two witnesses for the prosecution, one the son of the murdered man, a practicing lawyer in the District of Columbia, testified in rebuttal that during the trial one

12. 18 U.S.C. § 3500.

13. Schoppel v. United States, 4 Cir., 270 F.2d 413, 417 (1959); Throckmorton v.

St. Louis-San Francisco Ry. Co., 8 Cir., 179 F.2d 165, *cert. denied*, 339 U.S. 944, 70 S.Ct. 797, 94 L.Ed. 1359 (1950); 4 WIGMORE EVIDENCE § 1124 (3d ed. 1940).

of the defense witnesses had told them that the person he saw running from the scene of the murder was the defendant. The defense witness had previously testified that the defendant was not the man. The defense witness was then recalled to deny he made any such statement, and the son of the murdered man was again recalled to say that he did. The victim's son was the last witness in the trial. This recalling of witnesses at the bitter end of the trial was further complicated by the fact that the court gave no instruction to the jury limiting the impeachment testimony to discrediting the affirmative testimony of the witness sought to be impeached.[14]

 One of the purposes in segregating witnesses during a trial is to insure, as far as possible, that each gives his individual recollections of the events in suit, unaffected by the testimony of other witnesses. It is for this reason, too, that witnesses, before being segregated, are advised not to discuss the case with anyone other than counsel for either side. Failure to comply with this procedure resulted in the unusual recalling of witnesses by both sides near the close of the trial. And the failure to give the limiting instruction under these circumstances, particularly with reference to the impeachment testimony of the victim's son, increased the possibility of prejudice.

## VII

 Three weeks after the second robbery, police knocked at the door of appellant's apartment armed with a warrant for his arrest, not for the robberies and murder in suit, but for the armed assault on Officer Johnson.[15] Appellant's wife opened the door as far as a chain lock would allow and advised the officers, who had identified themselves and asked to speak with appellant, that she had not seen appellant for some time. When she refused to answer further questions, she was told that a pass key would be obtained if appellant did not come out. A pass key was located and placed in the lock. At that moment, according to the police testimony, a male voice from inside threatened to kill any police officer who came through the door. When one of the police stated that they only wanted to talk to him about the assault on Officer Johnson, appellant opened the door and was placed under arrest. A search of the bedroom turned up a loaded .38 caliber revolver.[16]

Testimony concerning the circumstances surrounding appellant's arrest was offered as indicating consciousness of guilt or resistance to arrest. We think the admission of this testimony, in the context in which the case was tried, was proper. Appellant, citing Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), argues that the attempted entry of the police into his home was illegal and that it was this illegal entry which provoked the threat. But on trial defense counsel stipulated that appellant's arrest was lawful. Thus it is a little late on this appeal to predicate an argument based on illegal entry of appellant's home. Counsel's stipulation, presumably made for tactical reasons, would not, however, be binding at any new trial.

For the reasons stated in Parts I through VI of this opinion, this case is reversed and remanded for severance and a new trial.

So ordered.

14. See Coleman v. United States, 125 U.S. App.D.C. ——, 371 F.2d 343 (No. 19,662, decided July 14, 1966); Byrd v. United States, 119 U.S.App.D.C. 360, 361, 342 F. 2d 939, 940 (1965); Bartley v. United States, 115 U.S.App.D.C. 316, 319 F.2d 717 (1963).

15. There is no indication in the record that appellant was suspected of the robberies and murder in suit here at the time of his arrest under the warrant.

16. The Government concedes that this gun was not used in the robberies and murder for which appellant was on trial.

DANAHER, Circuit Judge (dissenting):

## A.

My colleagues in the exercise of hindsight now rule that a severance should have been granted because the joinder was prejudicial.[1] Despite the jury's verdict, the majority has decided that "the evidence as to one of the robberies was so weak as to lead one to question its sufficiency to go to the jury." But Rule 8, as they are bound to concede, permits the joinder of two or more offenses in separate counts if they are "of the same or similar character."

Here, on October 12, 1964, the robber entered the Home Plate Liquor store, gun in hand, told the manager and a clerk to hold up their hands and warned of a holdup. Demanding money, the robber fired a pistol. The manager testified "I suddenly heard and felt a bullet go right over the top of my head." That bullet, recovered by the police, had been discharged from a .45 caliber gun.

October 29, 1964, a robber entered another liquor store. Gun in hand as he perpetrated his holdup, the robber promptly shot Lewis Brown, part owner of the store. His death had been caused by a .45 caliber bullet.

The expert ballistic testimony disclosed that the two bullets used in the robberies thus briefly mentioned had been fired from the same gun.

I submit that the Government was entitled to join in one indictment the counts which charged the described offenses. Convictions, to be sure, required further proof, but the District Court's ruling with respect to the joinder was addressed to the court's discretion, as Rule 14 makes clear. Reversal is called for only when that discretion clearly has been abused. Robinson v. United States, 93 U.S.App.D.C. 347, 349, 210 F.2d 29, 31 (1954); Opper v. United States, 348 U.S. 84, 95, 75 S.Ct. 158, 99 L.Ed. 101 (1954).

Drew v. United States, cited by my colleagues, is not to the contrary. Rather, this court noted in the *Drew* case that "A fundamental difference between two persons contemplating crimes of this character would be the degree to which each was prepared to use force to achieve his objective. Thus it is that the testimony about the use of the pistol in the one case, and not in the other, takes on enhanced significance." 118 U.S.App. D.C. 11, 18–19, 331 F.2d 85, 92–93 (1964).

The rationale of the *Drew* case clearly demonstrates the applicable principles. The distinction between the offenses there considered turned on the facts, as the *Drew* opinion makes clear. In the instant case, the essential elements of the crimes are identical. That Brown met his death in the second robbery and that the manager of the liquor store in the first did not, will not nullify the basic fact that a trigger-happy robber, willing to use force to achieve his objective, fired two .45 caliber bullets which came from the same gun.

## B.

The descriptions of the robber supplied by the witnesses at the scenes of each robbery made the robber out to be clean shaven. Gregory testified that he did not know his whereabouts on October 12 and October 29, 1964, but he did know, he claimed, that he then had been wearing a goatee. He called witnesses to establish his claim. His brother-in-law testified that the appellant had been wearing a goatee on October 13, 1964, a date which he was able to fix because that was his wife's birthday and she had spoken to the appellant about a birthday present. The appellant's sister fixed October 13, 1964 as the date when she saw Gregory wearing a goatee for she remembered seeing him on her eighteenth birthday. It is obvious these witnesses, not unlike people with whom we talk every day, associated a date with an event.

So it was, the Government called in rebuttal Officer Johnson to testify that three weeks earlier than the first rob-

---

1. So were the facts in this case.

bery, Gregory was clean shaven. Defense counsel, with the officer's reports in his hands, attempted to shake the officer's testimony as to the date when he had seen the cleanly shaven Gregory at Frank's Restaurant. After an episode which there occurred, the officer had gone to Gregory's mother's house to seek a picture of him. Defense counsel asked "When was that, sir?" The officer answered "That was on the day of—the day that he pointed the gun at me, sir."[2] That perfectly natural reply engages the notice of my colleagues who carefully avoid ruling that the judge should have declared a mistrial. I suggest that they quite well realize that defense counsel had himself evoked that very answer as he baited the officer. Defense counsel knew exactly what had been set out in the officer's report. He knew that on September 23, 1964, Gregory, according to the officer's report, had pointed a *gun at Officer Johnson in Frank's Restaurant.*[3] The defense is entitled to no advantage whatever, by insinuation in the majority opinion or otherwise, as a result of the attorney's having elicited the answer of which the same attorney has here complained.

### C.

At trial the manager of the Home Plate Liquor store positively identified Gregory as the man who had perpetrated the October 12th robbery and who had there fired the gun. On October 29th, when the second holdup occurred, Lewis Brown was in his liquor store. Present also were Brown's son-in-law, one Rosenstein, a salesman named Donald Rothbaum, and presently, one Caddell. As the latter entered the store the robber announced "This is a holdup." The robber ordered those present to lie down. Caddell apparently failed to move with sufficient alacrity, for the robber pistol-whipped him in the jaw—and Caddell

lay down. The robber fired the pistol, and Brown was hit in the back. Caddell testified that it was "a black gun, looked like a .45, and the hammer was cocked on it, ready to fire." The bandit seized cash amounting to some $2,400 or more and placed it in a brown paper bag. The bandit was described as "clean shaven."

As the robber was leaving the store, a tobacco salesman named Martin, from a distance of about 50 feet, observed the robber moving rapidly away and carrying a brown paper bag in one hand. The robber was clean shaven. The witness identified Gregory as that man. So did Rosenstein. Rothbaum described the robber as clean shaven, but having promptly obeyed the command to "Get down on the floor," he had not seen enough of the robber to be able to identify him.

Caddell identified Gregory in court. He had seen him at the police station after Gregory's arrest on November 17, 1964. By that time, Gregory was wearing a goatee. When asked in the presence of Gregory if he was the "person involved," the witness said he simply shook his head, but "two minutes later I told the detectives that was him, because I didn't want to say yes in front of him."

There is no point in going into further detail, and I have set forth such particulars only to suggest that the evidence of the crimes and the proof of the identification of Gregory overwhelmingly established his guilt. Those two .45 caliber bullets coming from the same gun spoke louder than words in establishing the connection of Gregory with both offenses.

No matter what one or two witnesses called by the defense said as to their doubts in some respects, Mrs. Bellamy, for instance, a customer in the store, described the robber as clean shaven,

---

2. That episode had led to the issuance of a warrant for the arrest of Gregory on a charge of assault with a dangerous weapon. Pursuant to that warrant, Gregory was arrested on the evening of November 17, 1964.

3. That officer might even have been called during the Government's case in chief to establish the basis upon which the process of identification of Gregory went forward.

and in other particulars corroborated Government witnesses. Despite the defense attempts to put a goatee on Gregory as of the critical dates, the jury rejected such testimony after a trial which commenced on June 21, 1965 and continued until June 25, 1965. The jury appraised the demeanor of the witnesses. It heard arguments in extensive review of all testimony. The jury must have found overwhelming the evidence of guilt. It was a jury case in its every aspect. The jury was polled and returned its verdict of guilty.

### D.

Expansion of my comments will serve no special purpose even as I decline to join my colleagues on yet other grounds wherein I think they are mistaken. As illustrative, however, note their statement that "Information favorable to the defense must be made available to the defense. Brady v. State of Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)." [4] I say, read that case. The Supreme Court told us precisely what it was holding, and it is not as just stated. Rather, the Court said:

> "*We now hold* that the suppression by the prosecution of evidence favorable to an accused *upon request* violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." (Emphasis added.) 373 U.S. at 87, 83 S.Ct. at 1196.

As to the Jencks Act statements, there was no such error as to require reversal. It is clear enough that the District Judge had not followed the practice we outlined in Reichert v. United States, 123 U.S.App.D.C. 294, 359 F.2d 278 (1966). But that case had not been decided until April of this year, and additionally there had here been no such implications

of abuse, to the prejudice of Gregory, as were seen in the *Reichert* record.

Viewed in its entirety, the instant case was fairly tried. There was no error adversely affecting Gregory's substantial rights.[5] I would affirm.

---

4. Then, notice, my colleagues are quick to add, "It is not suggested here that there was any suppression of evidence."
 Moreover, the record indicates that one witness the Government had intended to call became a witness for the defense because of his fears.

5. FED.R.CRIM.P. 52(a); and see Dichner v. United States, 348 F.2d 167, 168 (1 Cir. 1965).