**UNITED STATES of America,
Plaintiff-Appellee,**

**v.**

**David C. HENNY,
Defendant-Appellant.**

**No. 74–2717.**

United States Court of Appeals,
Ninth Circuit.

Oct. 20, 1975.

As Amended on Denial of
Rehearing Jan. 9, 1976.

John O. Burgess (argued), Seattle, Wash., for defendant-appellant.

Bruce D. Carter, Asst. U. S. Atty. (argued), Seattle, Wash., for plaintiff-appellee.

## OPINION

Before BROWNING, CARTER and GOODWIN, Circuit Judges.

JAMES M. CARTER, Circuit Judge.

Defendant Henny, President and General Manager of the Whidbey Telephone Company, appeals from a judgment of conviction, following a jury trial, of a number of counts of wire fraud in violation of 18 U.S.C. § 1343 and aiding and abetting under 18 U.S.C. § 2. He received sentences of three years on each count, to run concurrently, and a fine of $1,000 on each of ten counts. We affirm in part and reverse in part.

Whidbey Telephone Company ("Whidbey") is an independent company serving approximately 2,700 subscribers on two islands in Puget Sound, Washington. It is regulated by the Federal Communications Commission ("FCC") (interstate) and the Washington Utilities and Transportation Commission ("WUTC") (intrastate). The toll (long distance) facilities of Whidbey interconnect at Everett, Washington, with the General Telephone Company of the Northwest ("General"), which interconnects with Pacific Northwest Bell ("Bell") at Seattle. Since it was necessary for the lines of the various telephone companies to interconnect to provide service to all subscribers, the toll costs and revenues for toll calls were usually divided among the companies on the basis of toll settlement or division of revenue agreements. However, during the years 1961–66, Whidbey had no sharing agreement with General and accordingly did not share its revenue with General.

Under the settlement agreement in effect from 1967 through August 15, 1970, Whidbey undertook to pay all revenues or charges at tariff rates for certain types of toll messages to General (and a national toll "pool"), and General was to pay Whidbey an approximation of its toll costs under a formula determined by a 1966 study of Whidbey's toll costs. Three types of messages are important with respect to this formula:

*Sent paid* messages originated at a Whidbey telephone and were billed to that phone. Whidbey was compensated for both the operating and billing function.

*Sent collect* messages originated at a Whidbey telephone, but were billed to the terminating phone, hence compensation was only for the operating function.

*Received collect* messages terminated at a Whidbey telephone and were billed there, but originated outside the Whidbey area; hence compensation was only for the billing function.

Under the General-Whidbey settlement agreement, General paid Whidbey a fixed sum for messages billed to Whidbey phones (i. e., sent paid and received collect messages), regardless of the duration of the call. In return, Whidbey paid the tariff rates for each such sent paid or received collect toll message, but Whidbey's payments were determined by the duration and distance of the calls. The result was that Whidbey received the greatest net gain for calls of short duration and for sent paid messages. Whidbey received less on received collect and sent collect messages.

The settlement agreement was subjected to various types of fraudulent manipulation by Henny, who personally authorized the actions. One scheme involved "person call back messages" for person-to-person calls originating at Whidbey, where the called party was not at home and instructions were given for the called party to return the call. According to proper industry practice, the called party should have been instructed to call operator "6" or "7" in returning the call. Operators "6" and "7" were local operators to the called party (non-Whidbey operators). These operators would "ticket" the return call. Therefore the call would be a received collect call for Whidbey.

Where the calling party had asked for the time and charges of his call, under industry practices the called party was instructed to use operator "55" to return the call. Operator "55" was a Whidbey operator, hence the call would be ticketed by Whidbey under the lucrative sent paid category. This was proper practice because Whidbey handled the major aspects of a "time and charges" call.

The fraud involved in the above situations was as follows:

(1) Henny instructed his operators to leave the operator "55" number with the called party on *all* person call back calls. By this means all received collect calls would be converted into sent paid calls. Both the called party and his local operator would not discover the fraud because they would have mistakenly presumed that "time and charges" had been requested by the calling party.

(2) Henny's friends or relatives also utilized the operator "55" scheme. When outside of the Whidbey area, they contacted a local operator and asked for operator "55", thus indicating they were returning a person-to-person call. The Whidbey operator recognized the caller and put in a false busy signal, misrepresenting that the Whidbey line was busy. All parties would hang up and the Whidbey operator would then place a call directly to the calling party and report the call as a sent paid message.

(3) Another scheme to defraud involved the reporting of free calls made by Whidbey's employees and friends. Tariffs permit certain free long distance calls by company employees. But Henny caused the free calls made by himself, his employees, and friends to be reported to General as sent paid official company calls of three minutes or less in duration, when in fact many of these calls far exceeded three minutes. The settlement payments made to Whidbey for each sent paid call exceeded the three-minute charge for such a call. Whidbey thus collected unearned settlements from General in many of the instances when Whidbey reported an official company message as a sent paid message.

(4) Similarly, Whidbey gained revenues by giving free toll calls to its customers to obtain "time" information from the mainland in violation of the tariffs.

(5) Another fraudulent scheme involved Henny's inflation of the number of messages reported as placed from Whidbey to Seattle in order to induce the construction of a direct microwave link between Seattle and Whidbey.[1] Whidbey reported "test calls" as sent paid calls; it also gave free toll calls to a Seattle weather recording, and reported the calls as three-minute sent paid calls. Both tactics were fraudulent under industry standard operating practices.

(6) The final fraud involved a holding time test conducted during the week of May 3, 1971, to determine settlement payments. Henny properly established a "conference circuit" for the test, but he allowed and encouraged illegal users of the line, "phone phreaks", to use the line during the testing time, in order to increase General's settlement payments.

### Refused Instruction on Franking Privileges

1. The Washington Utilities and Transportation Commission conducted feasibility studies for such projects. It was this study which Henny manipulated.

Many of the fraudulent schemes involved calls by Henny, his family, friends and employees. Henny claims that these calls were permitted by statute as a franking privilege. 47 U.S.C. § 210 (1934) so provided. Pursuant to this theory he sought jury instructions to the effect that it was not fraudulent to permit free use of the phones by employees and family members.[2]

■ Although Henny's friends were entitled to calls free from the tariffs, the conversion of received collect to sent paid messages and the timing and ticketing of these calls at three minutes or less, regardless of actual duration, constituted fraud. Since the franking privilege was irrelevant to settlement agreements, it was proper to refuse to instruct the jury on the privilege.

### Jury Instruction

■ The trial judge gave an instruction to the jury which, Henny contends, was confusing and erroneous. In summary, the instruction stated that telephone companies are regulated by the FCC, that the companies also, by agreement, divide revenues obtained from the use of combined toll facilities, and that

any device which avoids the proper billing is unlawful.[3]

The appellant contends that, since the jury convicted him, it apparently mistakenly interpreted the trial judge's instructions to mean that the FCC's rules have the force of criminal law. However, the illegal practices defined in the judge's instruction referred only to the violation of the standard operating procedures adopted by companies to divide revenues and did not refer to the FCC's rules.

Further, Henny claims that the instruction suggested that the mere breach of contract was illegal. This claim is unfounded because, in the words of the instruction, there is no mention of breach of contract. Criminal liability was said to attach only to "any billing practice that does not reflect the true nature of the toll call . . . or any use of the toll line by any device that avoids the proper billing of the toll call."

A final criticism is that the instruction assumed controverted facts not in evidence. The court stated that "the companies have adopted standard operating practices." Henny's contention misses the mark because he did not assert that there were no common practices, but he claimed that he was not subject to those

---

2. The proposed instruction reads as follows:
   "It is not a crime for a telephone company to provide unlimited free telephone service to its officers, agents, employees and their families, and to officers and employees of other telephone companies. The unlimited free telephone service provided by a telephone company to these persons includes unlimited free long distance toll calls. There is no limitation upon the length of each free long distance telephone call."

3. The complete instruction reads as follows:
   "Now, this next instruction relates to telephone companies and their positions as far as being a common carrier is concerned. I am going to tell you what a common carrier is in the law, and how these companies must operate in accordance with the rules and regulations under the law. I might tell you this is one that I made up myself. This isn't something that is handed down.
   "Telephone companies are known in the law as common carriers, and are subject to the regulations by the government through what is known as the Federal Communica-

tions Commission. You have heard that described here. This commission, in a supervisory capacity, established certain rules under which telephone companies must operate. Interstate calls are toll calls, and certain charges must be made by the companies that control the lines over which these toll calls are carried. The companies also, by agreement, divide the revenues obtained from the use of the combined toll facilities. In order to determine the proper proportions of revenue for each company whose facilities have been used for a toll call, the companies have adopted standard operating practices providing for the timing of calls, and the point of billing, the ticketing, and the types of billing for the type of calls that are carried on connecting company lines. Any billing practice that does not reflect the true nature of the toll call as to the billing time, place of origin, nature of the toll call, or fails to show the use of the connecting lines or any use of the toll line by any device that avoids the proper billing of the toll call by the proper carrier is unlawful."

practices because of his relationship to General and the uniqueness of Whidbey. It is not reversible error for the court to give an instruction which assumes an uncontroverted fact. *Lyons v. United States,* 325 F.2d 370, 374 (9 Cir. 1963).

While the instruction was not perfect, we fail to grasp how the jury could have been confused. The instructions which directly preceded the instruction at issue carefully listed and explained the critical elements of the charge: the scheme to defraud, specific intent, and causation. Reading all of the instructions together, as we must, we find that the instruction fully and fairly presented the issues and that any error in the disputed instruction was harmless. *Suggs v. United States,* 132 U.S.App.D.C. 337, 407 F.2d 1272, 1276 (1969); *United States v. Fox,* 425 F.2d 996, 1000 (9 Cir. 1970).

### Exclusion of Evidence

■ Henny contends that Whidbey was entitled to recover its costs from General, that it could not recover such costs without the allegedly fraudulent practices, and that therefore the practices were proper. In support of this somewhat odd contention, the defense put on Henny's accountant, Mr. Bumstead, who testified that Whidbey had not recovered its costs from 1967 to 1970. On cross-examination, the prosecution sought to introduce two highly prejudicial letters to impeach Bumstead. Because of their prejudicial nature the court would not admit them, but instead struck Bumstead's testimony. Henny contends that this deprived him of his rights under the Fifth and Sixth Amendments to present witnesses and conduct a defense.

Whether or not the prejudicial nature of the letters would have warranted the striking of the testimony, the error, if any, was clearly harmless. All Bumstead could have shown would have been an overall loss. That would not have justified fraudulent practices, and Bumstead's testimony could not have helped Henny. *See United States v. Weiss,* 491 F.2d 460, 464 (2 Cir. 1974), *cert. denied,* 419 U.S. 833, 95 S.Ct. 58, 42 L.Ed.2d 59 (1974).

■ Henny also cites as error numerous exclusions of evidence made by the trial court on the ground of lack of relevance. Much of the proffered evidence related to industry-wide standards, but the evidence was irrelevant because either it post-dated the relevant time frame, or it involved the reporting practices of other individual companies pursuant to other types of settlement agreements. As to the latter, the time expended and confusion created by proving the reporting practices of individual companies outweighed the minimal aid such evidence would provide in proving industry-wide standards.

■ The appellant also claims that the court improperly restricted testimony of the defendant and other witnesses to the indictment period, 1967–70. Henny's defense was that the various practices found to be fraudulent were instituted for proper reasons prior to the settlement agreement with General, and hence were admissible to show he lacked the specific intent to defraud General.

This contention fails. Although the court did exclude testimony of some witnesses as to the prior practices, such evidence was admitted elsewhere. The court admitted testimony showing the prior practice as to free long distance time, weather, and wake-up calls; the use of operator "61" (changed from "55" to "61" in March, 1970) by Henny's family and friends; and the ticketing and reporting of employee and test calls. The issue was fully submitted and argued to the jury. The defense itself, in closing argument before the jury, stated that the testimony introduced described the practices that existed prior to 1967.[4]

4. The defense stated that,
"There has never been, in this trial, any dispute as to the practices that went on at

the Whidbey Telephone Company from the years early in 1960 up, almost to the present time. Those practices have not been in dis-

■ The court did exclude the answer to one relevant question. Henny was asked by defense counsel if the "operator 55 procedure [where friends would call "55" pretending to return a person-to-person call] was continued after January 1, 1971." The evidence was excluded because it was "outside the indictment period"; however, count VI of the indictment included fraudulent use of "55" from January 1971 to December 1972. Therefore we reverse count VI.

### Jencks Act Statements

The appellant raises three contentions about the handling of Jencks Act [18 U.S.C. § 3500 (1957)] statements: he had to request such statements in the presence of the jury, he did not have sufficient time to review the statements, and the trial judge's remarks regarding the statements were improper.

■ One circuit has held it to be error for the judge to force defense counsel to demand and receive such statements in the presence of the jury. *Gregory v. United States,* 125 U.S.App.D.C. 140, 369 F.2d 185, 191 (1966). Other courts have held this to be within the discretion of the Judge.[5] We do not choose to follow *Gregory.* Moreover, in the case at bar, the judge did not uniformly force defense counsel to receive the statements in the presence of the jury. The first time objection was made, the following colloquy occurred:

"THE COURT: We could have saved a lot of time if you [Mr. Carter, the

attorney for the government] had given him that [the statements] at recess time.

"MR. CARTER: Yes. Your Honor, I should have, and I am sorry."

On only one occasion thereafter did defense counsel have to ask for the statements in the presence of the jury.

■ The appellant's second contention, that counsel had inadequate time to review the statements, is also without merit. In the instance, cited above, where the statements were not furnished prior to the direct examination, co-counsel was present and able to review the statements. In addition, the defense did not ask for a recess.

■ Finally, the appellant cites as reversible error the statement of the judge, in front of the jury, that "[a]ll you [defense counsel] are looking for is some inconsistency in her testimony, if there is any." The record shows that defense counsel had objected to the procedure of allowing the trial to continue while co-counsel reviewed the statements withheld from the defense. In response to the objection the judge said, in essence, that he had hoped counsel had already examined the statements and that, in any case, co-counsel could adequately review them because he was present and would only be looking for inconsistencies.[6]

While the remark may have been better left unsaid, it was reasonable in the context of the trial. Also, we doubt that the defendant was prejudiced because

---

pute. . . . In the testimony, as you will recall it, was that in the year 1966, all of the types of calls that have been described to you as being a part of a scheme, a part of a method to defraud, previously existed."

5. *United States v. Lepiscopo,* 429 F.2d 258, 260 (5 Cir. 1970), *cert. denied,* 400 U.S. 948, 91 S.Ct. 255, 27 L.Ed.2d 254 (1970); *United States v. Nielson,* 392 F.2d 849, 854 (7 Cir. 1968).

6. The record shows the following discourse: "THE COURT: Do you [Mr. Carter, the attorney for the government] have another witness we can call so we can expedite this so we don't have to sit here while he reads it?

"MR. BURGESS [defense counsel]: Your Honor, I don't know what we are going to accomplish—
"THE COURT: Well, I had hoped that you would have had a chance to examine these. All you are looking for is some inconsistency in her testimony, if there is any, and you have a man sitting there with you, a man who heard all the testimony who is a lawyer, so why can't he look over this and inform you of anything you want to know about? Mr. Koopmans [co-defense counsel] can do that, he has heard everything the witness had to say."

this witness, whose Jencks Act statement was delayed, was only one of the many Whidbey operators who had testified to the practices of the company.

 Two issues remain. First, the trial judge, after a hearing, found that the government did not obstruct defense counsel's interviews with Bell employees. The finding was not clearly erroneous.

Secondly, our reading of eleven volumes of transcripts satisfies us that the appellant's contention of unfairness by the trial judge is exaggerated. The court's restatement of evidence and questions to witnesses was designed only to simplify the very complex facts of the case.

We affirm all counts except count VI. That count carried a three-year concurrent sentence and a $1,000 fine. The three-year concurrent sentence and the $9,000 fine for the remaining nine counts stand.