UNITED STATES of America, Plaintiff,

v.

PETER KIEWIT SONS' COMPANY, et al., Defendants.

Crim. A. No. 86–CR–129.

United States District Court,
D. Colorado.

Aug. 12, 1986.

William P. Sellers, IV, U.S. Dept. Justice, Washington, D.C., Peter Clark, for plaintiff.

Robert McAllister, Kevin Shea, Harold Haddon, Denver, Colo., for defendants.

## MEMORANDUM FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

CARRIGAN, District Judge.

In this criminal action, the defendants are charged with six counts of mail fraud, 18 U.S.C. § 1341, and with aiding and abetting those offenses. 18 U.S.C. § 2. Defendant Peter Kiewit Sons' Company is a Nebraska corporation with offices in Denver, Colorado. Defendants Harold L. Cher-

ry and Richard L. McVaney are Kiewit Company management officers.

The United States has charged that the defendants engaged in a "scheme and artifice" to defraud and obtain money unlawfully from the Colorado Department of Highways and the Federal Highway Administration in connection with the federally assisted bridge construction project at Debeque Canyon, Colorado. Defendants, prime contractors for the bridge project, allegedly deceived Colorado and federal officials regarding the extent of minority subcontractor participation in violation of certain federal regulations.

The criminal indictment was returned in the United States District Court for New Mexico. Venue was transferred to Colorado on the defendants' motion.

On July 22, 1986, I heard numerous defense motions, and denied all but one, a joint motion by the defendants seeking an opportunity for their counsel or investigator to interview certain prosecution witnesses outside the presence of government attorneys. While I did not order ex parte interviews such as the prosecution had conducted with these witnesses, I ordered that they make themselves available for depositions at which the prosecutors and the witnesses' personal attorney could be present. While that order was oral, from the bench, I began that night a brief memorandum opinion explaining my reasons for that unusual order. Unfortunately a six-day jury trial, a death in my family, personal illness, and a trial to court have delayed this opinion. Nevertheless, since I have been ordered to respond to the government's mandamus proceeding, I felt it my duty to state in writing my reasons for granting this unusual discovery. Thus this memorandum which constitutes the findings of fact and conclusions of law on which my order is based.

As indicated, the defendants, by a joint motion sought an opportunity to interview prosecution witnesses Floyd Jett and Donald Steele. Defendants contend that they are critical witnesses in this criminal prosecution who initially agreed to be interviewed by a defense investigator, R. Jon

Foster. Defense counsel assert that this change of mind occurred because government attorneys or agents advised these witnesses that they couldn't or shouldn't give statements to defense representatives. Defendants assert that their ability to prepare their defense, and their rights to confront and effectively cross-examine these adverse witnesses have been abridged.

On July 22, 1986, I held an evidentiary hearing on the defendants' joint motion. After that hearing I ordered the government to make certain prosecution witnesses available for depositions by defense counsel in the presence of government counsel. The order provided that the witnesses' personal counsel could be present if they so desired. I am now entering this written order to explain further the reasons for my ruling.

In support of their contentions, the defendants called their private investigator, R. Jon Foster. Foster served from 1968 to 1982 as a Denver Police Oficer, and had extensive experience as a detective, in the Intelligence Bureau, and as a member of the Colorado Attorney General's Organized Crime Strike Force.

Foster testified that he contacted Donald Steele by phone and was led to believe that Steele would grant him an interview. But the next day Steele told Foster he had decided not to talk. Foster asked him if he had talked to federal prosecutors or agents, and Steele said that he had. Steele refused to say whether these government agents had told him not to talk to the defense. About two weeks later Foster was in Albuquerque and went to see Steele in a further effort to obtain a statement. Steele said he didn't want to talk about the case because then "there would be two stories" and the defense attorneys would take what he told Foster and turn it around and make a fool of him in court. Steele stated that the prosecutors had warned him that would happen. Steele further told Foster that he, Steele, had been told by the prosecutors that although they couldn't tell him not to talk to the defense, they could tell him he probably shouldn't, and that anything he said would be used against

him later. Foster's meeting with Steele was cordial, thus indicating that it was not personal hostility toward the defendants that kept him from talking with Foster.

Similarly, witness Floyd Jett told Foster that the prosecutors had told him he "couldn't" talk with the defense. Jett immediately amended the "couldn't" to "shouldn't." At one point, Jett and his attorney, Thompson, told defense attorneys that Jett would give them a statement once an indictment had been returned, but after Thompson spoke with one of the prosecutors, he advised Jett not to do so because the government was going to make available to the defense a copy of the statement it had obtained from Jett. Clearly, Thompson had intended, before his conversation with the prosecutor, to honor his (Thompson's) prior agreement with defense counsel to make Jett available to the defense for a post-indictment interview. Jett personally desired to make his information about the case available to the defense as well as the government. Particularly Jett wanted defendant Cherry to have access to his information because Jett and Cherry were old friends. Access to Jett and his testimony changed dramatically after his interviews with government representatives and his grant of immunity.

Likewise, a third witness, Katherine Williams, informed Foster that she had been told by the prosecutors that she couldn't talk with him. She indicated that both a male and a female Justice Department attorney had so advised her, as had a male employee of the Department of Transportation. She, too, later altered her terminology to "shouldn't" rather than "couldn't."

Two other government witnesses also declined interviews with Foster. Witness Stephen Gerow initially agreed to be interviewed and scheduled an appointment with Foster. When Foster called Gerow to confirm the appointment, Gerow stated that he did not want to talk to him. Richard Persky also initially agreed to an interview. When Foster and two of the defense attorneys arrived at his office, Persky refused the interview, apparently on the advice of

an attorney in the Colorado Attorney General's office.

Of these witnesses, Jett, Steele and Williams all have given multiple interviews to the government, all outside the presence of any defense representative.

After investigator Foster testified, the government called Jett, Steele, Williams and their attorney, Neils L. Thompson, to testify. Thompson initially had been retained to represent Jett in any criminal prosecution that might arise in the event that an indictment arising out of the facts of this case should be returned against him. Jett was granted "letter immunity" by the government.

Attorney Thompson testified that he was present when the government attorneys told Jett that he did not have to speak with defense counsel and that he could talk or could refuse to talk with them. Jett was interviewed by the government at least two or three times in Thompson's presence. However, the government conducted other interviews with Jett when Thompson was not present.

Thompson's testimony is significant in other respects. Thompson had advised defense counsel that Jett would talk with them if an indictment was returned. After the indictment was returned and Jett was granted letter immunity, however, Jett refused to discuss the case with the defense. Thompson testified that he advised his client not to talk with defense representatives.

Thompson also stated that nothing was said in his presence by the government attorney to indicate that Jett should not speak with defense counsel. However, the government representatives spoke with Jett several times when Thompson was not present. Thompson further stated, moreover, that the government attorneys made it "obvious" that they preferred that Jett not discuss the case with the defense.

In fact, Thompson testified that it had been made obvious to him that if the prosecutors had their "druthers," they would prefer that Jett and the other witnesses not be interviewed. Thompson stated that his clients, the witnesses, were "bright" people

and he felt that they too had drawn this clear inference from the prosecutors' statements and conduct.

Jett testified that he declined to be interviewed based on his own attorney's advice. He further testified that the government attorney advised him that he was not required to give the defense an interview, but that he could do so if he chose. The evidence indicated that Jett gave three or four interviews to the government, the last of which, at least, was reduced to writing. Jett stated that the written statement taken by the government embodies his testimony in this case.

Both Steele and Williams testified that the government told them that they could speak to defense counsel or not, as they wished.

As is readily apparent, the evidence was sharply disputed. I based my findings and conclusions primarily on my finding that the defendants' professional investigator, Foster, and the witnesses' attorney, Thompson, were the most credible witnesses. In doing so, I considered, as to all the witnesses, their apparent background, training and experience in assessing the importance of facts such as those in dispute, their manner and demeanor on the witness stand as non-verbal communication of their own feelings, their apparent motives not to offend the government and thus risk prosecution themselves, or lack of such motives, their apparent strength of memory and availability of contemporaneously taken notes, the reasonableness of their testimony, inconsistencies in their testimony and all the circumstances.

Having heard the witnesses and considered the affidavit, I find and conclude that the investigator, Foster, testified truthfully that he had been told by Jett and Steele that government representatives had told each of them that they couldn't or shouldn't talk with defense representatives. Furthermore, I find and conclude that the witnesses Jett, Steele and Williams had been persuaded, either by statements or conduct of the prosecutors, that if they gave interviews to defense representatives,

what they said would be twisted so that at trial they would be put in the position of having given two or more conflicting versions of the facts. In other words, I find that these witnesses had been led to believe that anything they might say to defense representatives would be used against them to confuse and undermine their testimony at trial.

Moreover, I find and conclude from the testimony of Neil Thompson, counsel for all three witnesses, that the witnesses got the clear mental impression or message that the prosecutors preferred that these witnesses not talk to defense representatives. I find and conclude, from the circumstantial evidence, that this prosecutorial attitude was communicated to the witnesses by words, implications or non-verbal conduct of the prosecutors, either intended or unintended. I further find that in advising his clients not to speak with defense representatives, attorney Thompson was strongly influenced by the inference he had drawn from the prosecutors' words and conduct that the government did not want these witnesses, Thompson's clients, talking to the defense.

I further find that these three witnesses were particularly vulnerable to suggestion and anxious not to offend the prosecutors. They had seen their business associates, the defendants, indicted for six federal felonies, not through action of any local official or familiar United States Attorney in Colorado or New Mexico, but by the Justice Department itself reaching from Washington, D.C. into their lives. They apparently were concerned that if the defendants could be indicted so could they be. Indeed, one of them, Jett, had to be granted letter immunity before he gave the government a complete statement. I find that when Foster asked them for interviews, and when they testified on these motions, they were anxious to please the government because, in their minds at least, they were walking the tightrope of prosecutorial discretion from the threat of imprisonment to the hope of freedom.

All three witnesses had been interviewed repeatedly by the government attorneys or agents, without any defense representative present, and written statements had been taken. The government has agreed to make copies of these statements available to defense counsel. But defense counsel wish to interview the witnesses in private. It is understandable that defense attorneys might have entirely different questions to ask witnesses than those put by the prosecutors. Likewise, it is understandable that the witnesses might now be reluctant to be interviewed *ex parte* by defense counsel, especially since they have been advised that anything they say may be twisted and used to confuse or contradict them at trial.

Generally, witnesses do not "belong" to either side in a criminal case. Absent compelling circumstances, both the government and the defense have a right to interview witnesses prior to trial. *United States v. Cook,* 608 F.2d 1175, 1180 (9th Cir.1979) *cert. denied* 444 U.S. 1034, 100 S.Ct. 706, 62 L.Ed.2d 670 (1980).

■ Standard 3–3.1(c) of the American Bar Association Standards for Criminal Justice states that "A prosecutor should not discourage or obstruct communication between prospective witnesses and defense counsel." Thus, the right of the defense to have access to witnesses in a criminal case should be unfettered and free of government intervention. As stated in *Gregory v. United States,* 369 F.2d 185 (D.C.Cir.1966):

"A criminal trial, like its civil counterpart, is a quest for truth. That quest will more often be successful if both sides have an equal opportunity to interview the persons who have the information from which the truth may be determined. The current tendency in the criminal law is in the direction of discovery of the facts before trial and elimination of surprise at trial. A related development in the criminal law is the requirement that the prosecution not frustrate the defense in the preparation of its case." *Id.* at 188.

■ After hearing all the evidence, I find and conclude that the prosecution's statements to the witnesses discouraged them from communicating with the defense. Although it has not been shown that government attorneys ordered the wit-

nesses not to be interviewed by the defense, it is apparent to me that the prosecution's "advice" and conduct at least strongly implied that the witnesses should decline the requested defense interviews. This case, therefore, is factually distinguishable from *United States v. Pinto*, 755 F.2d 150 (10th Cir.1985).

In a criminal case, the government has available to it vast resources not available to the defense through which to investigate and prepare for trial. Highly professional government investigators gather the evidence while government attorneys assimilate and organize it for the courtroom. Potential witnesses can be subpoenaed for interviews, or summoned before the grand jury and they may fear retribution from the government if they refuse to cooperate in a criminal investigation. This power is likely to have a chilling effect on witnesses.

I conclude that, for whatever reason, whether intended or unintended, the prosecution's conduct has substantially chilled these witnesses' previously expressed willingness to discuss the facts with the defense. The defendants are charged with six serious felonies. It would be grossly unfair to them if the government should be allowed to gain a major advantage at trial by stifling access to key witnesses prior to trial.

I further find and conclude that the prosecution's actions have unfairly hampered the defendants' investigation in this criminal matter. While I have considered dismissing the indictment as a possible sanction to deter such conduct in the future, and also have considered granting the defendants' request for *ex parte* interviews, those sanctions seem overly harsh or inappropriate. Probably this problem would not have arisen had this case been commenced in Colorado and prosecuted by personnel of the United States Attorney's Office conversant with the usual standards of open discovery and fair play normally observed in this district.

In fairness, the government should not be allowed to cut off defense access to witnesses who, but for prosecutors' advice, would be willing to speak with defense representatives. Unlike in civil cases, the deposition is generally authorized in criminal cases only to preserve testimony. Rule 15(a), Fed.R.Crim.P. But Rule 16(d)(1), which governs "Regulation of Discovery," authorizes the trial judge to "make such other order as is appropriate" in regulating discovery. Here I conclude that it is not only appropriate, but essential to avoid a denial of due process to reopen the access to these witnesses that existed before the government's actions. While the remedy here provided probably cannot fully undo the damage, it may at least provide defense counsel an opportunity to speak with these vital witnesses in a neutral atmosphere where both the interests of the witnesses and of the government can be protected by the presence of counsel.

In the interest of justice, and pursuant to Rule 16(d), Federal Rules of Criminal Procedure, as well as this court's inherent power to enforce fair proceedures to assure fair trial, it is ordered that witnesses Floyd Jett, Donald Steele and Katherine Williams submit to being deposed by the defense at a time and place agreeable to the parties and convenient to the witnesses. I note that neither the three witnesses involved nor their counsel has objected to this procedure. If any witness refuses to be deposed, defense counsel shall immediately notify the court so the matter can be set for a hearing and possible sanctions considered.