NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-3479-18T4

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

GREGORY A. MARTINEZ,

      Defendant-Appellant.

_____

APPROVED FOR PUBLICATION

October 29, 2019

APPELLATE DIVISION

Argued October 2, 2019 – Decided October 29, 2019

Before Judges Sabatino, Sumners and Natali.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Indictment No. 17-05-0586.

Jeffrey S. Farmer argued the cause for appellant (Mazraani & Liguori LLP, attorneys; Jeffrey S. Farmer and Joseph M. Mazraani, on the briefs).

Joie D. Piderit, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for respondent (Christopher L.C. Kuberiet, Acting Middlesex County Prosecutor, attorney; Joie D. Piderit, of counsel and on the briefs).

Valeria Dominguez, Deputy Attorney General,  argued the cause for amicus curiae State of New Jersey Office of the  Attorney General (Gurbir S. Grewal, Attorney

General, attorney; Valeria Dominguez, of counsel and on the briefs).

Joseph J. Russo, Deputy Public Defender, argued the cause for amicus curiae State of New Jersey Office of the Public Defender (Joseph E. Krakora, Public Defender, attorney; Joseph J. Russo, of counsel and on the briefs).

John J. O'Reilly argued the cause for amicus curiae Association of Criminal Defense Lawyers (McElroy, Deutsch, Mulvaney & Carpenter, LLP, attorneys; John J. O'Reilly, of counsel and on the briefs; Courtney A. Johnson, on the brief).

The opinion of the court was delivered by

SABATINO, P.J.A.D.

This novel case concerns a prosecutor's office's use of body wires on a paid informant, an anticipated trial witness for the State in a narcotics case, to secretly monitor and record a criminal defense attorney's pre-trial interview of that informant.

An assistant prosecutor authorized the surreptitious taping based upon information – which turned out to be untrue – that the attorney might offer the witness a bribe. When the prosecutor's office supplied the recording and a transcript of it to the attorney in discovery three days before his client's trial, he moved to dismiss the indictment, or, alternatively, to bar the witness's testimony for the State.

In its oral ruling, the trial court remarked that the secret recording in this

2

case "should send a chill down the spine of any criminal defense attorney or prosecutor [who] has ever interviewed a witness." The court found the prosecutor's office lacked reasonable suspicion that "evidence of criminal conduct would be derived from [the] interception." Nonetheless, the court concluded the defense's trial strategy had not been sufficiently divulged during the taped interview "to the extent that would justify" the dismissal of indictment or preclusion of the witness's testimony. The court adopted a more limited remedy, barring the State from using the taped interview as evidence at trial. Defendant moved for leave to appeal, which we granted.

For the reasons that follow, we affirm the trial court's decision in part, modify it in part, and remand it in part. As conceded by defendant and related amici, the informant's secret taping of the interview with his one-party consent did not violate the New Jersey Wiretapping and Electronic Surveillance Control Act ("the Wiretap Act"), N.J.S.A. 2A:156A-1 to -34. However, we hold that mere compliance with the Wiretap Act does not mean that the secret taping is permissible, particularly in the manner in which it was conducted in this case. Specifically, without appropriate limitations, such recording can have the capacity to infringe upon a criminal defendant's constitutional right to fair and unimpeded access by his counsel to interview government witnesses, and the capacity to reveal attorney work product. The surveillance of attorney

3

interviews also can implicate ethical norms, particularly those governing prosecutors.

Based on the record developed thus far, we conclude the prosecutor's office erred in allowing detectives in the State's narcotics case and the attorney misconduct case to work jointly in the efforts to record the witness interview. The prosecutor's office further erred in allowing the assistant prosecutor who was handling the narcotics case to have access to the fruits of the surreptitious taping.

Under the circumstances presented, the prosecutor's office instead was obligated to create two screened "taint teams" to proceed independently in: (1) the attorney conduct investigation and (2) the narcotics case. Because of that failure, and because attorney work product from the recorded interview was prejudicially divulged to the narcotics prosecutor and staff, the narcotics case must be transferred for handling by either the Attorney General or by another designated county prosecutor's office.

Further, we remand the case for the trial court to conduct a plenary hearing to determine the extent to which the informant-witness may have been unfairly coached or influenced by the manner in which he was prepared by the State for the taped interview and the manner in which he was debriefed afterwards. Depending upon the results of that plenary hearing, a possible appropriate

4

prophylactic remedy may be to disallow the informant-witness from testifying for the State at the narcotics trial. On remand, the trial court also shall determine if other prosecutorial witnesses were tainted because of their involvement in or exposure to the recording or its transcript.

Lastly, we recommend that the Attorney General consider promulgating statewide guidelines and procedures addressing any future surreptitious prosecutorial taping of witness interviews by defense counsel.

## TABLE OF CONTENTS

I. Factual and Procedural Background........................................................... 6
    The Indictment and the Alleged Cocaine Sales ........................................... 6
    Defense Counsel's Interview of Cruz........................................................... 7
    The State Turns Over the Interview Recording and Transcript on the Eve of Trial................................................................................................................. 8
    Defendant's Motions .................................................................................... 8
    The Present Interlocutory Appeal ................................................................ 9
    More Details Concerning the Recorded Interview ...................................... 9
    Cruz Meets with Detectives on March 11 and Consents to the Wire ......... 12
    The Recorded March 12, 2019 Defense Interview ..................................... 13
    Charges Lodged Against Policastro............................................................. 15
    The April 11 Motion Hearing...................................................................... 15
    The Motion Judge's Ruling ......................................................................... 16
    Proceedings Before the Presiding Criminal Judge ..................................... 18

II. The Wiretap Act..................................................................................... 18
    Requirements of the Wiretap Act ............................................................... 19
    The 1999 Amendment Eliminating the Reasonable Suspicion Standard ..... 21
    The "Indispensable Protection" of Supervisory Review ............................ 22
    Special Considerations in Authorizing Intercepts of Attorneys ................. 24
    Judicial Reviewability of Wiretap Authorizations ..................................... 26
    Comparative Discussion of the Federal Wiretap Act and the Justice Manual .................................................................................................................. 28

The "Relevance" Standard ............................................................. 31

III. Infringement Upon Defendant's Constitutional Rights and Work Product
Disclosure .............................................................................. 33
    Constitutional Provisions and Principles .................................... 33
    State v. Blazas ...................................................................... 34
    Gregory v. United States ......................................................... 37
    Other Cases.......................................................................... 38
    The State's Pre-Wire Preparation of Cruz ................................... 40
    The Attorney Work Product Privilege ........................................ 42
    At Least Some Work Product Was Revealed Here ......................... 50

IV. Ethical Rules Addressing Clandestine Recording By Attorneys and the
Special Duties of Prosecutors ...................................................... 51
    ABA Opinion 337 .................................................................. 51
    ABA Formal Opinion 01-422 .................................................... 52
    The New Jersey RPCs ............................................................ 54
    Special Ethical Restrictions Imposed on Prosecutors ..................... 54
    The Need for "Fire-walls" or "Taint Teams".................................. 57
    Summary ............................................................................. 58

V. Implications and Remedies ....................................................... 59

VI. Conclusion ......................................................................... 69

I.

(Factual and Procedural Background)

The Indictment and the Alleged Cocaine Sales

In July 2016, a Middlesex County grand jury returned Indictment No. 17-05-0586, charging defendant Gregory A. Martinez with:

- three counts of third-degree possession of a controlled dangerous substance, N.J.S.A. 2C:35-10(a)(1) (counts 1, 5, and 8);

- three counts of second-degree distribution of a

6

controlled dangerous substance, N.J.S.A. 2C:35-5(a)(1) and N.J.S.A. 2C:35-5(b)(2) (counts 2, 6, and 9);

- two counts of third-degree distribution of a controlled dangerous substance near or on school property, N.J.S.A. 2C:35-5(a) and N.J.S.A. 2C:35-7(a) (counts 3 and 7); and

- one count of second-degree distribution of a controlled dangerous substance within 500 feet of certain public property, N.J.S.A. 2C:35-5(a) and N.J.S.A. 2C:35-7.1(a) (count 4).

The charges resulted from three instances between March 22 and July 8, 2016, during which defendant allegedly sold cocaine to Delvi Cruz. Cruz was then cooperating with the county prosecutor's office as a confidential informant ("CI"), pursuant to a plea agreement.[1]

Defense Counsel's Interview of Cruz

After learning the identity of the CI, defense counsel for Martinez, Joseph M. Mazraani, requested, through Cruz's counsel Michael A. Policastro, to conduct a pretrial interview with Cruz.

On March 12, 2019, Mazraani and his investigator Dave Gamble met with

---

[1] The record indicates Cruz is no longer serving as a CI, and his identity has been revealed in open trial court proceedings and in records that were not filed under seal. Accordingly, with the consent of all counsel, we refer to Cruz by his actual name in this opinion. In some documents, Cruz is referred to as Cruz-Santos or Santos. For consistency, this opinion refers to him as Cruz.

7

Cruz in Policastro's office (the "Mazraani interview"). [2] Policastro, who apparently was in court on another matter that day, was not present for the Mazraani interview. Nor was anyone there in person from the prosecutor's office.

Unbeknownst to the defense or to Policastro, Cruz wore two listening devices at the interview: one on his waist and another in his pocket. Cruz wore the devices at the request of detectives from the prosecutor's office, whose personnel recorded the Mazraani interview as it occurred.

The State Turns Over the Interview Recording and Transcript on the Eve of Trial

Just three days before the scheduled trial date the State turned over certain discovery to the defense, including a recording and the rough transcript of the Mazraani interview, as captured on the device Cruz had worn at his waist.

Defendant's Motions

After receiving the recording and rough transcript, defendant immediately

---

[2] The record contains three separate transcripts of the Mazraani interview. The one provided to the trial court which was made by the prosecutor's office from the less clear of two recordings, contains many "inaudible" designations. The court found that rough transcript largely "unintelligible." In connection with this appeal, both the State and defendant had a transcript made of the clearer recording. A third transcript was made and certified by a professional transcriber, which is the one defendant had made. The State does not dispute this third version is the most accurate transcription of the recording of Mazraani's interview with Cruz, and the Attorney General cites to it in his amicus brief rather than the rough transcript.

8

moved to dismiss the indictment or, in the alternative, to bar Cruz's testimony.

On April 11, 2019, the trial court denied the motion to dismiss and the defense's application for a stay of the trial. However, the court held that: (1) the State could not use the Mazraani interview recording at trial, (2) the defense could use the recording, if it desired, to impeach Cruz, and (3) jury selection would be briefly adjourned.

The Present Interlocutory Appeal

Defendant filed an application for emergent appellate relief and also moved for leave to appeal. The Association of Criminal Defense Lawyers of New Jersey ("ACDL-NJ") moved to appear as amicus curiae in support of defendant's position.

We granted defendant's motion for leave to appeal, and the ACDL-NJ's amicus motion. We also invited the Attorney General and the Office of the Public Defender to participate as amici, and ordered a stay of defendant's trial. Both the Attorney General and the Office of the Public Defender accepted our invitation to appear as amicus curiae.[3]

More Details Concerning the Recorded Interview

The record reveals this additional background concerning Cruz's

---

[3] We are grateful for the helpful participation of all three amici in this accelerated matter.

9

surreptitious recording of his interview with Martinez's counsel.

In early March 2019, Cruz received a call from Policastro stating that Mazraani "wanted to communicate with" him. Cruz also received an Instagram "friend request" from defendant. Cruz reported these contacts to both a Detective and Sergeant from the prosecutor's office. The Sergeant was heavily involved in the narcotics case, and the record shows the Detective was involved in the attorney investigation. At the very least, they both took part in recruiting Cruz for the wiretap and in carrying out the recording. Both officers are identified on the interview transcript as being "present" when the body wire was active. The Sergeant is the first and last voice on the recording. The State has announced it plans to call him as a witness at defendant's narcotics trial.

Cruz recounted the events leading to the Mazraani interview in a transcribed statement he gave to detectives on March 14, 2019, two days after the interview occurred (the "March 14 statement"). Cruz explained his initial reaction to the interview request:

> And um. I was surprised. I asked my attorney what's going, what these people want from us? He said he don't know, he probably, my attorney tell me that he probably want to talk about a case. And I asked my attorney why you don't talk to them? That way I don't have to be involved with any conversation. He said no he want to talk to you directly. If you'll be able to talk to him let me know and I, we make a meeting in my office and you meet over there . . .

10

Referring to the Detective, Cruz "notified the detective in the prosecutor office" that Mazraani wanted to meet with him. In his March 14 statement, Cruz explained:

> [Cruz:] I called Michael Policastro again to tell him that we gonna have the meeting and I ask him again what exactly they want from us and the answer was he don't know exactly what they want from us. <u>They probably want to talk about a case or they might want to offer something</u>. I ask him . . .
>
> Q. <u>They want to offer what exactly</u> . . .
>
> A. I asked, I asked my attorney what exactly they, he believe they probably gonna ask or offer. (inaudible) and <u>he said I'm not sure but they probably could ask can [sic] offer money another offer [sic]. I don't know exactly what they want</u>. They probably want to talk about a case, but I don't know anything about this. They just, I just give an idea what could happen [sic].
>
> Q. Did he say how much money if anything?
>
> A. No.
>
> Q. No[?]
>
> A. <u>He just assuming what they, what they could offer</u> [sic].
>
> Q. Okay.
>
> A. Just give an idea.
>
> [(Emphasis added).]

11

After reporting his conversation with Policastro to the Sergeant on Friday, March 8, 2019, Cruz "called Policastro . . . to set up a meeting" with Mazraani in Policastro's office.

That same day, March 8, a Deputy First Assistant Prosecutor signed a "Consensual Interception Authorization" allowing the detectives to intercept Cruz's communications during the following ten days. The wire authorization form identified Mazraani and Policastro as the two "Target(s)," and listed "Witness Tampering" under "Initial Crimes or Offenses."

The record does not reveal what other information, if any, the Deputy First Assistant possessed before signing the wire authorization. In particular, there is nothing to indicate whether the Deputy First Assistant was aware that the named "targets" were attorneys, that the recording would take place at a law firm, or that the recording would be of a pre-trial defense interview.

Cruz Meets with Detectives on March 11 and Consents to the Wire

On Monday evening, March 11, Cruz met at a diner with the Detective, Sergeant, and another officer. Cruz discussed, as he put it, "everything," and gave consent to wear a wire and record his meeting with Mazraani in Policastro's office.

In his report about the March 11 meeting, the Detective wrote that Cruz had stated that Policastro "indicated to [him] that Mazaraani [sic] wanted to

12

speak about the case, and that typically in those meetings they offer him money." According to this report, Cruz "stated that he told Policastro that he intended on notifying the Prosecutor's Office of this meeting."

The Recorded March 12, 2019 Defense Interview

The Mazraani interview took place on the afternoon of Tuesday, March 12, 2019. According to a report by the Detective, Cruz was functioning during the interview "in an undercover capacity . . . for the purpose of determining if witness tampering would be occurring inside of The Policastro Law Firm[.]" Cruz was paid what were characterized on an expense voucher as lost "wages" of $180 for performing this function.

Cruz did not tell Policastro or Mazraani that he recorded the meeting. Cruz had expected Policastro would attend the meeting, but was told that Policastro had a trial and could not be there.

At the start of the interview, Cruz said he "[j]ust got out of work early" when Mazraani thanked him for taking the time to meet.

Mazraani told Cruz that he and Policastro "go way back." When asked if Policastro had told him what Mazraani wanted to talk about, Cruz answered, "Not exactly." Mazraani then explained:

> MAZRAANI: I represent a guy who the police are saying sold you drugs.
>
> CRUZ: Okay.

13

MAZRAANI:  Okay?  And we're going to trial soon.

CRUZ:  Okay.

MAZRAANI:  And I just wanted to talk to you a little bit about that and just ask you some questions about that.  You got nothing to worry about.  This has nothing to do with you.  This has to do with–same thing that Mike [Policastro] did for you, I got to–you know, I got to do my job.

Cruz asked the name of Mazraani's client and said he spoke to someone at the prosecutor's office about the Martinez case "[l]ast week."  Mazraani explained to Cruz that he wanted Cruz to "just answer some very basic questions" and it was up to Cruz to decide if he wanted to answer them.

Cruz remarked that he had asked Policastro why Mazraani would want to talk to him, and Mazraani answered that "it's witness preparation."  After Cruz agreed to answer the queries, Gamble, the defense investigator, asked, "Are we going to record this?"  Mazraani answered, "No, not right now, unless he [Cruz] tells me later that he wants to."

Mazraani then proceeded to ask Cruz about the three alleged drug transactions.[4]

---

[4]  To avoid any revelations that could affect the future handling of the narcotics case by a different prosecutor, we will not discuss in this opinion the substance of those discussions.

14

When he finished the interview, Mazraani asked if Cruz would give the defense a taped statement, but Cruz declined. Cruz did not reveal that the State had already made a recording of the entire interview up to that point.

Charges Lodged Against Policastro

On April 4, 2019, three complaint warrants were issued against Policastro, charging him with witness tampering in cases unrelated to Mazraani or defendant.[5]

The April 11 Motion Hearing

At the April 11, 2019, hearing on defendant's dismissal motion, Mazraani argued the issue was not then suitable for disposition because he had not received discovery he requested from the State about the circumstances of the interview. Mazraani also stated the ACDL-NJ wanted to join the case as amicus.

The prosecutor argued the motion could be decided without a need for discovery into the recording arrangements. He asserted that asking Cruz to record the Mazraani interview had "nothing to do with" defendant. Instead, it "[h]ad to do with the fact that a target [Policastro] who is now being charged with three different counts of witness tampering told a CI that if he met with

---

[5] According to the State's supplemental brief, Policastro was indicted on these charges on September 11, 2019. At oral argument on appeal, the prosecutor represented that Mazraani is not named or implicated in any of the counts in the Policastro indictment.

[defense] counsel, there might be money involved."

The trial court asked the prosecutor if Mazraani was "a target of this investigation." The prosecutor responded, "Judge, I don't know. As far as I know, he was not. But I don't know." The prosecutor further stated that he had "no particular knowledge," when the court asked why the interview was recorded[6] even though Policastro had not been present. The prosecutor stated that Cruz was paid $180 "because he missed a day of work."

The prosecutor insisted that the recording issue concerned only the Policastro case and "whether it was reasonable for the prosecutor's office" to record the meeting as part of its ongoing investigation of that case. The prosecutor explained the recording was made after "hearing from [the] CI who was represented by Mr. Policastro being told that if he went to this meeting, there's usually money involved with this meeting." The court responded that the prosecutor's representation was "a very wide reading of the evidence, of even what Mr. Policastro supposedly said[.]"

The Motion Judge's Ruling

Addressing the recording issue, the motion judge stated:

---

[6] The judge noted that he could not determine initially whether trial strategy was discussed at the Mazraani interview "because the [first] transcript that I have is all unintelligible." The judge was ultimately supplied with a more accurate transcript.

16

First, this [c]ourt recognizes that <u>this is an extraordinary measure</u>. That an attorney is recorded by law enforcement while interviewing a witness in a pending criminal charge <u>should send a chill down the spine of any criminal defense attorney or prosecutor that has ever interviewed a witness</u>.

[(Emphasis added).]

The court then added:

<u>. . . I find</u> that at least what has been provided to me, that <u>a reasonable suspicion</u> that evidence of criminal conduct would be derived from such interception, <u>does not exist as to Mr. Mazraani that would justify these actions</u>.

[(Emphasis added).]

The court nevertheless denied the defense motion to dismiss the indictment or, in the alternative, to bar Cruz's testimony, stating:

However, none of this is relevant to this matter. I do not find that a trial . . . strategy was divulged to the State to the extent that would justify the dismissal of the indictment or barring the testimony of Del[vi] Cruz.

The court then turned to the subject of remedy:

Further, even if a reasonable suspicion did not exist to justify a consensual interception, the remedy is not to dismiss the indictment or bar the witness in this matter. The State will not use any portion of the consensual recording of Del[vi] Cruz, and that's an order of this Court. The defense may use it for purposes of cross and for credibility purposes.

17

Mazraani requested a stay and for an adjournment of the trial to allow his client to consult with independent counsel. The court denied the stay motion, but ruled that jury selection would be deferred to Tuesday, April 16.

Proceedings Before the Presiding Criminal Judge

Later that day, Mazraani wrote to the presiding judge of the Criminal Part (Middlesex County) seeking relief. In response, the presiding judge held a hearing and conducted a voir dire examination of defendant on April 12. The presiding judge asked defendant at that hearing if he was aware that the Mazraani interview had been recorded and that Mazraani's representation of him "could be compromised." The judge advised defendant could opt to "continue with [Mazraani], consider whether [Mazraani's] representation was compromised, request that another attorney represent him or have a Public Defender appointed." Defendant asked for additional time to hire new counsel.[7] The presiding judge "requested that the parties come back" the morning that trial was set to begin.

We then granted defendant's motion for leave to appeal, staying the trial.

II.

(The Wiretap Act)

---

[7] Defendant nonetheless has continued to be represented by Mazraani's office in this interlocutory appeal.

18

The prosecutor's office surreptitiously monitored and recorded Mazraani's interview of Cruz pursuant to the statutory authority of the Wiretap Act. Defendant does not argue that the recording of the Mazraani interview violated the Wiretap Act, and neither do the ACDL-NJ or the Public Defender.

Nevertheless, the provisions of the Wiretap Act are germane to this appeal because the trial court held that reasonable suspicion was "still a standard that ha[d] to be met" under the Wiretap Act. The court found the State did not have reasonable suspicion to believe that evidence of criminal conduct would be derived from recording the Mazraani interview. In effect, the trial court held the State had violated the Wiretap Act and granted defendant the limited exclusionary relief expressly afforded under that statute, although it did not phrase its ruling in that way.

Requirements of the Wiretap Act

The Wiretap Act "regulates the electronic interception of communications in New Jersey. . . . Its purpose is to protect citizens' privacy from unauthorized intrusions." State v. Toth, 354 N.J. Super. 13, 21 (App. Div. 2002) (citing State v. Minter, 116 N.J. 269, 275 (1989)). The Act provides that, with certain exceptions, "any person who . . . [p]urposely intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept any wire, electronic or oral communication . . . shall be guilty of a crime of the third

19

degree." N.J.S.A. 2A:156A-3.

Detailing its exceptions, the Act states, in pertinent part, "[i]t shall not be unlawful" for:

> c. Any person acting at the direction of an investigative or law enforcement officer to intercept a wire, electronic or oral communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception; provided, however, that no such interception shall be made without the prior approval of the Attorney General or his designee or a county prosecutor or his designee.
>
> [N.J.S.A. 2A:156A-4(c) (emphasis added).]

The Attorney General and county prosecutors must "maintain records of all interceptions authorized pursuant to [the consent provision of N.J.S.A. 2A:156A-4(c)] . . . on forms prescribed by the Attorney General." N.J.S.A. 2A:156A-23. "Such records shall include the name of the person requesting the authorization, the reasons for the request, and the results of any authorized interception." Ibid. Copies of the records must be "periodically" filed with the Attorney General, who "shall report annually to the Governor and Legislature on the operation of" the consent provision. Ibid.

The Wiretap Act "is closely modeled after the federal statute," 18 U.S.C. § 2510 to § 2523 (the "federal Wiretap Act"), although the New Jersey version has some "additional requirements which are not found in the federal statute."

20

State v. Sanchez, 149 N.J. Super. 381, 394-96 (Law. Div. 1977).

Before the New Jersey statute was amended in 1999, one such "additional requirement" was that the State was precluded from intercepting a communication in which one party consented "unless the Attorney General or his designee or a county prosecutor within his authority determines that there exists a reasonable suspicion that evidence of criminal conduct will be derived from such interception." Toth, 354 N.J. Super. at 18-19 (emphasis added).

In contrast, the federal Wiretap Act requires only that at least one party to a conversation give prior consent to its interception by the government, without any additional authorization requirement. 18 U.S.C. § 2511(2)(c).[8] See also United States v. Caceres, 440 U.S. 741, 744 (1979) (noting that Internal Revenue Service regulations required prior authorization for a consensual recording, but "[n]either the Constitution nor any Act of Congress" had this requirement).

The 1999 Amendment Eliminating the Reasonable Suspicion Standard

The consent provision of our Wiretap Act was amended in 1999, eliminating the "reasonable suspicion" element. Toth, 354 N.J. Super. at 18-19. The Legislature retained the need for prior authorization, but it allowed for that approval to be granted by the county prosecutor, Attorney General, or a

---

[8] However, as we discuss, infra, the United States Department of Justice has established guidelines for consensual wiretaps, which include seeking prior authorization in every case.

21

designee. Ibid.

The "Indispensable Protection" of Supervisory Review

Even before the reasonable suspicion standard was excised from the Wiretap Act, our Supreme Court acknowledged that "the conditions for authorization of consensual wiretaps [we]re not as strict as those applicable to non-consensual wiretaps." State v. Worthy, 141 N.J. 368, 381 (1995). The Court nevertheless considered the prior authorization requirement to be vital, noting that, in cases of consensual interceptions, it was the "sole protection" citizens had "from overly zealous and completely discretionary law-enforcement practices." Ibid. As the Court explained:

> Although the statutory condition for the interception of a consensual wiretap is less onerous than, and hence not as protective of privacy as, the conditions that surround the nonconsensual interception of conversations, it cannot be doubted that the Legislature viewed the requirement of supervisory approval as an indispensable protection for the privacy interests implicated even in consensual telephone wiretaps.
>
> [Id. at 381-82 (emphasis added).]

The Court accordingly held in Worthy that a recording obtained at the direction of a prosecutor's investigator without prior authorization violated the Wiretap Act and had to be suppressed, notwithstanding an absence of intentional wrongdoing. Id. at 386.

The attorney approval requirement serves an important function in

22

overseeing covert recordings by police and other law enforcement personnel, who may not as readily recognize the legal risks of recording that may encroach upon a defendant's rights.

The importance of strict adherence to the prior authorization requirement was not affected by the amendment to the Wiretap Act eliminating the reasonable suspicion element. That point was illustrated in State v. K.W., 214 N.J. 499, 503-04 (2013). In K.W., the State failed to obtain authorization for a consensual wiretap due to an inadvertent failure of communication. Ibid. The Court rejected the State's argument that "the removal of the requirement that the designated prosecutor find 'reasonable suspicion' before authorizing a consensual intercept 'strongly suggests that approval of consensual interceptions is now essentially [only] an administrative, procedural function of the prosecutor.'" Id. at 506. The Court held the principles of Worthy still required the strict interpretation and application of the prior authorization requirement. Id. at 509-10.

Here, the trial court made a factual finding that the State lacked reasonable suspicion to believe evidence of a crime could be obtained by recording the Mazraani interview. As the parties agree, however, the trial court's finding is not dispositive or relevant under the statute, because a showing of reasonable suspicion is not required under the amended Wiretap Act. In order for the

23

recording to be permissible under the Act, the only express statutory requirements were: (1) consent by Cruz, and (2) prior approval by an authorized person, both of which the State obtained in this case.

Special Considerations in Authorizing Intercepts of Attorneys

That said, two additional queries are implicated by the Wiretap Act. Specifically: (1) Does N.J.S.A. 2A:156A-11, which imposes special requirements for approval of non-consensual wiretaps taking place in an attorney's office, impact the analysis here?; and (2) Given that reasonable suspicion is no longer required under the Act, what standard, if any, applies to the prior authorization process, and is the authorization judicially reviewable?

As to the first question, the Public Defender contends that N.J.S.A. 2A:156A-11 reflects a policy-based intent by the Legislature to subject consensual intercepts involving lawyers to "greater scrutiny than other consensual intercepts." In response, the State and the Attorney General argue that N.J.S.A. 2A:156A-11, which applies to non-consensual wiretaps, is wholly irrelevant to consensual wiretaps.

The provisions codified in N.J.S.A. 2A:156A-8 to -9 detail the circumstances under which the Attorney General or a county prosecutor can apply for a court order authorizing a non-consensual wiretap and the requirements for making such an application. N.J.S.A. 2A:156A-10 sets forth

24

the required grounds for issuing such an order, including, in pertinent part, that "there is or was probable cause for belief that" three elements are satisfied: (1) the target of the wiretap engaged in or was about to engage in a criminal offense, (2) the wiretap would provide "[p]articular communications concerning such offense," and (3) "[n]ormal investigative procedures with respect to such offense have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous to employ."

N.J.S.A. 2A:156A-11 specifies "additional grounds" that must exist to authorize non-consensual wiretaps of public facilities or "facilities of persons entitled to privileged communications." As to the latter locations, the statute provides:

> If the facilities from which, or the place where, the wire, electronic or oral communications are to be intercepted are being used, or are about to be used, or are leased to, listed in the name of, or commonly used by, a licensed physician, a licensed practicing psychologist, an attorney-at-law, a practicing clergyman, or a newspaperman, or is a place used primarily for habitation by a husband and wife, no order shall be issued unless the court, in addition to the matters provided in section 10 of P.L.1968, c. 409 (C. 2A:156A-10), determines that there is a special need to intercept wire, electronic or oral communications over such facilities or in such places.
>
> [(Emphasis added).]

If the wiretap under Section 11 is to occur at the facilities of an attorney,

25

the "special need" intercept requirement obliges the applicant to show that the attorney "is personally engaging in or was engaged in over a period of time as a part of a continuing criminal activity or is committing, has or had committed or is about to commit an offense as provided in" N.J.S.A. 2A:156A-8. Notably, Section 8 sets forth a list of offenses that does not include witness tampering.[9]

The plain language and structure of the statute show the "special need" requirement in Section 11 applies only to non-consensual wiretaps. That said, the statute at least reflects that the Legislature was concerned about indiscriminate recording of conversations in the offices of attorneys, where confidential discussions and work product communications commonly occur.

Judicial Reviewability of Wiretap Authorizations

We next consider what standard applies to the authorization of consensual wiretaps. Section 4 of the Wiretap Act literally requires only prior approval for such consensual wiretaps. The provision does not specify any grounds or standards for granting such approval. Moreover, the Legislature's 1999 amendment of the Wiretap Act to remove the reasonable suspicion standard arguably signals an intention to allow consensual wiretaps to occur more often

---

[9] The federal Wiretap Act does not provide "comparable special protection" for wiretaps occurring at attorney premises. State v. Ates, 426 N.J. Super. 614, 626 (Law. Div. 2009) (quoting Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, cmt. 1 on N.J.R.E. 504 (2009)), aff'd, 426 N.J. Super. 521 (App. Div. 2012), aff'd, 217 N.J. 253 (2014).

and under less restrictive circumstances. This could be interpreted to mean, at least as far as the Wiretap Act is concerned, that the Attorney General, prosecutor, or relevant designee has unfettered discretion to authorize consensual wiretaps under any circumstances and for any reason.

Along these lines, the State contended in its supplemental brief that the prosecutor's authorization of a consensual wiretap is "not subject to judicial review." However, at oral argument on this appeal, the County Prosecutor and the Attorney General both acknowledged that prosecutors who review proposed consensual interceptions under Section 4 typically apply a baseline standard of "relevance."

Interpreting the Wiretap Act to enable unfettered and unreviewable discretion by prosecutors could render the prior authorization requirement merely a perfunctory task. If an official can review a request for a consensual wiretap and approve it based on any reason – including, hypothetically, a whim, bias, or personal animus – then the approval process would serve no real purpose. This is particularly so if, as the State contends, the approval is never subject to judicial review. We decline to adopt that categorical legal position.

As we have already noted, the Legislature opted to retain the prior authorization requirement in 1999 when it removed the reasonable suspicion standard. In 2013, the Court in K.W. reiterated that prior authorization was more

27

than simply an administrative or procedural nicety, but was intended by the Legislature as an "indispensable protection" to "safeguard personal privacy." K.W., 214 N.J. at 509-10 (quoting Worthy, 141 N.J. at 379). Hence, the prior-authorization review by the relevant official must operate in some way to strike a balance between investigative and privacy concerns, even without a need for reasonable suspicion. That, in turn, signifies that the approval process must satisfy some standard other than unfettered discretion.

Comparative Discussion of the Federal Wiretap Act and the Justice Manual

A comparative discussion of the system implemented under the federal Wiretap Act is useful. Although the federal statute itself imposes no requirement on law enforcement for a consensual wiretap other than obtaining the consent of at least one party, in the Justice Manual ("JM"),[10] the Department of Justice ("DOJ") has promulgated highly detailed guidelines for executing both consensual and non-consensual wiretaps. U. S. Dep't of Justice, Justice Manual, Title 9, §§ 7.010 to 7.302 (2018).

The JM advises that consensual wiretaps, as well as warrantless interceptions of oral communications in places where the parties have no

---

[10] The JM, previously known as The United States Attorney's Manual, was comprehensively revised and renamed in 2018. The full text of the current manual is available at https://www.justice.gov/jm/justice-manual.

justifiable expectation of privacy, "are particularly effective and reliable" techniques.  Id. at § 7.301.  Nevertheless, the JM cautions:  "While these techniques are lawful and helpful, their use is frequently sensitive, so they must remain the subject of careful self-regulation by the agencies employing them." Ibid.  Thus, the DOJ "developed guidelines for the investigative use of consensual monitoring, which were promulgated most recently by the [United States] Attorney General on May 30, 2002."  Ibid.

Unless every party to a communication has consented to its monitoring, the JM procedures require some form of prior authorization of all consensual wiretaps.  Id. at § 7.302.  A written approval at a higher level by a Deputy Assistant Attorney General in the Criminal Division of the United States Department of Justice is required when "the monitoring concerns an investigation into an allegation of misconduct committed by" certain specified officials, including members of Congress, federal judges, or executives above a designated level.  Id. at § 7.302(II).

Where written authorization is required, the federal wiretap request must contain certain information, including but not limited to:  (1) the anticipated location of the monitoring, (2) "the length of time needed for the monitoring," (3) the names of the persons to be monitored and "the relation of such persons to the matter under investigation or to the need for the monitoring," (4) "a

29

reasonably detailed statement of the background and need for the monitoring," and (5) "a citation to the principal criminal statute involved" if the monitoring is for investigative purposes.  Id. at § 7.302(III).

The prior approval for federal consensual wiretaps can be in oral form where the monitoring "do[es] not involve the sensitive circumstances" inherent in wiretaps of the designated officials, but that approval "must come from the head of the agency or his or her designee."  Id. at § 7.302(V).  Further, all federal departments or agencies engaging in consensual monitoring must "maintain internal procedures for supervising, monitoring, and approving all consensual monitoring of oral communications," and must maintain records that include the monitoring details "for each consensual monitoring that they have conducted." Ibid.[11]

The consensual wiretap guidelines in the JM reflect the DOJ's concerns

---

[11]   We are mindful that, although the procedures in the JM are set out in mandatory terms, the manual cautions that it "provides internal DOJ guidance" and "is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter civil or criminal."  U. S. Dep't of Justice, Justice Manual, Title 1, § 1.200 (2018).  Courts have confirmed that the manual guidelines do not confer substantive rights.  See, e.g., United States v. Lopez-Matias, 522 F.3d 150, 155-56 (1st Cir. 2008) (holding that the government's failure to follow "death penalty protocols" in manual did not, alone, create a basis to dismiss its notice of intent to seek death sentence); United States v. Myers, 123 F.3d 350, 355-56 (6th Cir. 1997) (holding that the government's violation of its internal operating procedures did not create a basis for suppressing grand jury testimony).  Hence, we look to the JM only for comparative guidance.

about the possibility of lack of uniformity, abuse, unjustified monitoring, and invasion of privacy. To create an appropriate balance between the various competing interests, the DOJ has developed procedures in the JM to assure fairness and adherence to uniform standards.

The "Relevance" Standard

Here in New Jersey, the Wiretap Act similarly requires law enforcement officers to obtain the prior approval of the Attorney General, prosecutor, or designee. That sign-off requirement presumably exists because an attorney will be in a better position than, say, a police officer to balance issues of constitutional rights, attorney ethics, or the possible disclosure of privileged communications or work product against the legitimate needs of an ongoing criminal investigation.

Presently, New Jersey does not have procedures or guidelines similar to those in the JM. A designated attorney for the state must approve the request under Section 4. But there is no guidance as to what information must be provided to the decision-maker before approval, when and under what circumstances approval is appropriate, or how the reviewing official should balance the legitimate need for investigation against the competing concerns of privacy, work product, and constitutional rights.

31

As we noted, the Attorney General and the prosecutor represented to us at oral argument that an operational standard of "relevance" is customarily observed before consensual intercepts are approved under Section 4. We agree that such intercepts should not be pursued unless they are expected to yield relevant information. See N.J.R.E. 401 (articulating the general standard for relevant evidence). At a minimum, relevance should be required. Even so, we can conceive of situations in which a planned intercept of an attorney interview is pursued with mixed objectives; e.g., where it is nominally sought to obtain relevant evidence, but principally based upon animus against a defense attorney or defendant.

Defendant and the defense amici argue such animus was present here. In this regard, they point to a February 16, 2016 memorandum issued within the prosecutor's office, advising assistant prosecutors to not engage in off-the-record communications with Mazraani. They also note the prosecutor's office has moved to disqualify Mazraani as counsel in four cases unrelated to the present one.[12]

We will not adjudicate the animus claim in this interlocutory appeal. For one thing, the record is not adequately developed on the point. The State

---

[12] We are not informed of the bases or outcomes of those disqualification motions.

maintains that its past motions to disqualify Mazraani were justified, as was the internal office memorandum.

The trial court made no findings concerning the animus claim. Moreover, the Supreme Court has not spoken to the issue. Nor is there any existing written Attorney General policy on the subject. We need not decide today whether proven animus could nullify an authorization likely to yield relevant evidence. As we will discuss, infra, there are other sufficient grounds to provide defendant in this case with relief.

III.

(Infringement Upon Defendant's Constitutional Rights and Work Product Disclosure)

We turn to whether the prosecutor's clandestine recording of the Mazraani interview, despite its compliance with the Wiretap Act, infringed upon defendant's constitutional rights. As a related matter, we examine whether the interview prejudicially revealed defense counsel's privileged work product to the Middlesex County assistant prosecutor and staff who were assigned to handle defendant's narcotics case.

Constitutional Provisions and Principles

"The Sixth Amendment of the United States Constitution and Article I, paragraph 10 of the New Jersey Constitution establish a defendant's right to the assistance of counsel in criminal prosecutions." State v. Sugar, 84 N.J. 1, 15-16

33

(1980). The right to a "thorough defense investigation is also part of the right to counsel." State v. Nunez, 436 N.J. Super. 70, 74-75 (App. Div. 2014). See also State v. Mingo, 77 N.J. 576, 582 (1978) (holding that, to safeguard the right to counsel, "it is essential that [defense counsel] be permitted full investigative latitude in developing a meritorious defense"). Accord Coppolino v. Helpern, 266 F. Supp. 930, 933 (S.D.N.Y. 1967) (holding that the Sixth Amendment grants a criminal defendant the right "to gather evidence which may be useful to him in his defense, including the right to interview willing witnesses, free from state interference").

The briefs of counsel and our own research have not identified any reported cases directly addressing the constitutionality of a prosecutor's act of sending a witness into a criminal defense interview wearing a recording device. However, case law applying general constitutional principles informs our analysis in this factually novel scenario.

State v. Blazas

An especially instructive case is our opinion in State v. Blazas, 432 N.J. Super. 326 (App. Div. 2013). In Blazas, a defense investigator sought to interview the defendant's ex-fiancée and five police officers. The investigator alleged he was told by a police detective that the ex-fiancée had been instructed not to speak with him, and by a police captain that a prosecutor had "advised

34

against giving a 'go ahead' for interviews" with the five police officers because the prosecutor "did not feel that it would necessarily be beneficial for the prosecution." Id. at 332-33. The prosecutor contended the detective "denied having any conversation with the defense investigator," and objected to the court "taking the word" of the defense investigator. Ibid.

The trial court in Blazas acknowledged that, if the defense investigator's allegations were true, the detective did not "understand his obligation" under the law and the captain may not have had a "right not to tell people not to speak to folks." Id. at 333. Nevertheless, the trial court noted that witnesses "don't have an obligation to speak to anyone," and it held that the defense's "best remedy" for any impropriety was through cross-examining the affected witnesses at trial. Ibid.

We reversed that decision. Id. at 346. We underscored that both the United States and New Jersey Constitutions guarantee a criminal defendant a meaningful opportunity to present a complete defense, including access to evidence. We held that "access to witness testimony falls within this constitutional guarantee." Id. at 339 (citing Crane v. Kentucky, 476 U.S. 683, 690 (1986), and State v. Garron, 177 N.J. 147, 168 (2003)).

As we noted in Blazas, the New Jersey Supreme Court has made clear that "a 'defendant's due process rights are violated when there is substantial

35

government interference with a defense witness'[s] free and unhampered choice to testify[.]'" Ibid. (quoting State v. Feaster, 184 N.J. 235, 251 (2005)). The holdings in other New Jersey cases "mirror those in federal cases where government action has thrown roadblocks to the testimony of witnesses who would be favorable to the defendant." Id. at 340. Accord State v. Marshall, 148 N.J. 89, 284 (1997) (holding that law enforcement officials had no duty to consent to defense interviews, but adding, "Of course, if the State were to interfere with a defendant's ability to answer criminal charges by using its influence to discourage witnesses from speaking to counsel or counsel's agents, a very different case would be presented").

That said, we acknowledged in Blazas that "[n]ot every action by the prosecution coupled with a witness's refusal to be interviewed will constitute substantial interference with a witness's choice in deciding whether to speak to the defense." 432 N.J. Super. at 343. However, if the defense investigator's allegations in Blazas about government interference were true, then "it was the State, and not the witness, who made the decision to deny defendant access" to the interviews. Id. at 345. As we reasoned:

> Therefore, just as substantial interference with a witness's decision to testify constitutes a violation of a defendant's constitutional rights, such interference with a witness's decision to grant or deny an interview to the defense also deprives a defendant of his right to present a complete defense. We note that the protected right is

36

the opportunity for pretrial access; it is not a guarantee of pretrial access.

[Id. at 343 (emphasis added).]

The trial court's proposed remedy in Blazas of allowing cross-examination of affected witnesses at trial "d[id] not resolve the [constitutional] due process issue," because "[t]he right to present a complete defense encompasses access to adverse witnesses during the investigation phase of the defense." Id. at 340. We rejected the trial court's belief that "there was nothing he could do" to remedy the situation because he "could not compel witnesses to speak to the defense against their will." Id. at 346. We did not specify what the appropriate remedy might be. Instead, we remanded the case for an evidentiary hearing, to determine whether the witnesses, as claimed, had been instructed not to submit to defense interviews. Id. at 345-46.

Gregory v. United States

The watershed federal case we mainly relied upon in Blazas was the District of Columbia Circuit Court's opinion in Gregory v. United States, 369 F.2d 185 (D.C. Cir. 1966). Gregory was a capital murder case in which the eyewitness testimony of several witnesses was critical. Id. at 187. Before trial, "[t]he prosecutor embarrassed and confounded the accused in the preparation of his defense by advising the witnesses to the robberies and murder not to speak

37

to anyone unless he were present."  Ibid.  The Circuit Court in Gregory held that this was prejudicial error, explaining:

> Witnesses, particularly eye witnesses, to a crime are the property of neither the prosecution nor the defense. Both sides have an equal right, and should have an equal opportunity, to interview them.  Here the defendant was denied that opportunity which, not only the statute, but elemental fairness and due process required that he have.
>
> [Id. at 188 (emphasis added).]

"A criminal trial, like its civil counterpart, is a quest for truth.  That quest will more often be successful if both sides have an equal opportunity to interview the persons who have the information from which the truth may be determined."  Ibid.  Although the Gregory court acknowledged that there had been no "direct suppression of evidence" by the government, it noted that "there was unquestionably a suppression of the means by which the defense could obtain evidence."  Id. at 189.  In the court's judgment, "the prosecutor's advice to these eye witnesses frustrated" the defense's right to "a fair opportunity" to interview them and, thus, "denied appellant a fair trial."  Ibid.

Other Cases

38

Consistent with the holdings in Blazas and Gregory, it is unquestionably improper for a prosecutor to tell a witness not to speak with defense counsel.[13]

However, it is permissible for a prosecutor to inform witnesses, in a neutral manner, that they can choose whether or not to speak with defense counsel.[14]

---

[13] See, e.g., United States v. Peter Kiewit Sons' Co., 655 F. Supp. 73, 75-78 (D. Colo. 1986) (holding that a prosecutor's advice to a witness that he "probably shouldn't" talk to the defense because "there would be two stories" and defense counsel might "turn it around and make a fool of him in court" was improper, because it "substantially chilled [the] witnesses' previously expressed willingness to discuss the facts with the defense."); State v. Williams, 485 S.E.2d 99, 101-02 (S.C. 1997) (holding that it was not harmless error for a prosecutor to tell a witness it was not in his "best interest" to talk to the defendant's attorney); State v. Hofstetter, 878 P.2d 474, 481 (Wash. Ct. App. 1994) (holding it was improper for a prosecutor to advise witness not to speak with defense counsel without a prosecutor present, even though State was prosecuting a case against the witness); People v. Jackson, 253 N.E.2d 527, 533 (Ill. App. Ct. 1969) ("The prosecuting attorney cannot direct witnesses not to speak to the defendant or his counsel or otherwise deprive them of a fair opportunity for an interview."); See also 31 N.J. Practice, Criminal Practice & Procedure § 13:46, at 692-93 (Leonard N. Arnold) (2018 ed.) (noting that "[i]t is improper for the prosecutor to advise witnesses not to talk to anyone unless a prosecutor is present," but the prosecutor may "merely advise a witness of the witness's right not to submit to an interview with defense counsel").

[14] See, e.g., United States v. Black, 767 F.2d 1334, 1338 (9th Cir. 1985) (no interference found where a prosecutor sent letter to witnesses with subpoena explaining pretrial and trial procedures and correctly stating, "At some point prior to trial you may be contacted by an attorney on behalf of the defendant. You may speak to this person if you choose, but have no obligation to do so."); Corbett v. Patterson, 272 F. Supp. 602, 610 (D. Colo. 1967) (finding no impropriety where "[a]t the most, the record indicates that the district attorney told his witnesses that they did not have to speak to anyone"); State v. Guzman, 71 P.3d 468, 469-71 (Idaho Ct. App. 2003) (prosecutor "merely informed"

39

The cases involving government interference with defense witness interviews show that acting to block or discourage the interview from taking place is unconstitutional conduct. The cases stress, in this regard, that witnesses do not belong to either side. The exertion of control by the government that restrains a witness's free choice to grant a private interview to the defense is improper. That includes attempts to interfere with the witness's free choice to attend the interview without a government representative present, to decline to have a record of the conversation made, and to decide what details of the interview, if any at all, should be shared with the government afterwards.

The State's Pre-Wire Preparation of Cruz

In the present case, we do not know fully from the record what the prosecutor's office or its detectives told Cruz before he agreed to wear a wire for the interview. For instance, we do not know whether Cruz had expressed any reluctance to secretly record the conversation, or whether he was told he would violate his cooperation duties under his plea agreement if he refused to cooperate in that manner.

witness that speaking with defense counsel "was his choice," without discouraging communication); State v. Wilson, 316 S.E.2d 46, 48 (N.C. 1984) (finding that a prosecutor's statement to a witness that she did not have to speak with defense counsel, unless she wanted to, did not obstruct defense attempts to conduct interviews).

We also do not know how the $180 payment Cruz received for taking part in the recorded interview was calculated or negotiated. The expense voucher is uninformative. The State characterizes the $180 sum as lost "wages," although the record does not reflect how much time Cruz actually missed from work and his normal rate of compensation. The transcript includes a comment by Cruz that he left work "early," but does not quantify the time he missed. We therefore cannot evaluate whether the $180 payment was reasonable.

Nor do we know whether the prosecutor's office and detectives consistently and appropriately advised Cruz that he had the right to refuse to wear the wire, and that it was entirely his choice as to whether he submitted to the interview and, if so, on what terms. We also do not know whether Cruz was advised, in preparing for the interview, whether he should raise certain topics that might provide insights about defense counsel's possible trial strategy. The trial court declined to allow discovery into these matters.[15]

The State and the Attorney General argue the recording of the defense interview was innocuous. They correctly assert the defense did not "own" Cruz as a witness. They also correctly point out that Cruz had the right to

---

[15] Although we have no reason to presume that improper coaching occurred, as we note in Part V, the record should be explored to confirm that.

41

communicate with the prosecutor's office after the interview was over, and divulge from recollection what had been discussed.

But the State and the Attorney General also contend Mazraani and defendant therefore could have no expectation of privacy about the interview. They further maintain that no privileged work product was revealed during the interview, and that the trial court erred in finding that some work product was disclosed. We disagree on these points for several reasons.

The Attorney Work Product Privilege

"The attorney work product privilege prohibits disclosure of certain materials prepared by an attorney in anticipation of litigation, and thereby 'creates a zone of privacy in which an attorney can investigate, prepare, and analyze a case.'" State v. DeMarco, 275 N.J. Super. 311, 316 (App. Div. 1994) (quoting In re Grand Jury Subpoena Dated Nov. 8, 1979, 622 F.2d 933, 935 (6th Cir.1980)). "The development of the attorney's work product privilege was mainly designed 'to afford a measure of protection to the attorney's privacy against pretrial disclosure of his litigation strategies, his mental processes and the like.'" Mingo, 77 N.J. at 584 (quoting State v. Montague, 55 N.J. 387, 401 (1970)).

The work product privilege was recognized by the United States Supreme Court in the seminal case of Hickman v. Taylor, 329 U.S. 495, 510-11 (1947),

42

where the Court observed:

> [I]t is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel. Proper presentation of a client's case demands that he assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference.

In discussing the scope of this protection, the Supreme Court stated that attorney work product "is reflected, of course, in interviews, statements, memoranda," and other things. Id. at 511. In United States v. Nobles, 422 U.S. 225, 238 (1975), the Court made clear that the work product doctrine applies in criminal cases, explaining that "[a]t its core, the work product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case."

The work product privilege is recognized in our Rules of Court. Under those rules, the defense is obliged to provide the State with certain reciprocal discovery. R. 3:13-3(b). In pertinent part, the defense must provide

> written statements, if any, including any memoranda reporting or summarizing the oral statements, made by any witnesses whom the State may call as a witness at trial. The defendant also shall provide the State with transcripts of all electronically recorded witness statements by a date to be determined by the trial judge, except in no event later than 30 days before the trial date set at the pretrial conference.
>
> [R. 3:13-3(b)(2)(D).]

43

The attorney work product privilege applicable to criminal cases in our State is governed by subsection (d) of Rule 3:13-3, which provides:

> Documents Not Subject to Discovery. This rule does not require discovery of a party's work product consisting of internal reports, memoranda or documents made by that party or the party's attorney or agents, in connection with the investigation, prosecution or defense of the matter nor does it require discovery by the State of records or statements, signed or unsigned, of defendant made to defendant's attorney or agents.
>
> [(Emphasis added).]

In State v. Williams, 80 N.J. 472, 478 (1979), the Supreme Court addressed whether the defense obligation to supply prosecutors with any statements "made by any witnesses whom the State may call as a witness at trial" required the defense to disclose photographs shown to the victim during a defense interview and a summary of her statements during the interview identifying the defendant. The Court held that the defense's discovery obligation "does not give the State access to statements or summaries of statements made by its witnesses to defense counsel during defense preparation for trial if defense counsel does not intend to use them at trial." Id. at 478. The Court observed that "[t]o hold otherwise would infringe on a defendant's constitutional right to the effective assistance of counsel because of the chilling effect it would have on defense investigation." Ibid.

No case has specifically addressed the requirement of Rule 3:13-

44

3(b)(2)(D), which was adopted after the Court decided <u>Williams</u>, that the defense provide "transcripts of all electronically recorded witness statements" as well as written statements.  However, the rationale of <u>Williams</u> applies with equal force to recorded witness statements.  Obligating the defense to produce such materials when it does not intend to use them at trial would potentially have a chilling effect on its investigation, thus interfering with a defendant's rights.  Moreover, it would be illogical to conclude that <u>Rule</u> 3:13-3(d) would protect a written transcript of an interview the defense did not intend to use at trial, but not protect an electronic recording.

In <u>State v. Tier</u>, 228 N.J. 555, 559-60 (2017), the Court held that the defense's obligation under <u>Rule</u> 3:13-3(b)(2)(C) to provide the State with statements of its own witnesses did not permit the trial court to order the defense to create written synopses of their anticipated testimony where none had existed.  The Court ruled that written statements "need only be produced if they exist," and "if the defense has not memorialized the witness statement in some form of writing there is nothing to produce."  <u>Id.</u> at 564.

The Court based its holding in <u>Tier</u> on the plain language of the rule, as well as "the confidentiality concerns raised by disclosure of work product."  The Court stressed "one of the underlying principles on which our criminal justice system is based," namely that "a defendant 'has an absolute, unqualified right to

45

compel the State to investigate its own case, find its own witnesses, prove its own facts, and convince the jury through its own resources.'" Id. at 563 (quoting Williams v. Florida, 399 U.S. 78, 112 (1970) (Black, J. concurring in part and dissenting in part)).

In the oft-cited federal case of International Business Machines Corp. v. Edelstein, 526 F.2d 37, 40 (2d Cir. 1975) ("IBM"), in which the parties anticipated there would be hundreds of witnesses, a dispute arose regarding access to witnesses for interviews. At a pretrial conference, the district court ordered "that if any one of you seeks to interview a witness in the absence of opposite counsel, that you do it with a stenographer present and so that it can be available to the [c]ourt, for the [c]ourt to see it, and I think that is the kind of condition that I would ask you to live up to." Id. at 41.

The Second Circuit granted IBM's petition for a writ of mandamus and held that the district court exceeded its authority in issuing the pretrial order. Id. at 41-42. The Circuit held that the district court's conditions were "contrary to time-honored and decision-honored principles, namely, that counsel for all parties have a right to interview an adverse party's witnesses (the witness willing) in private, without the presence or consent of opposing counsel and without a transcript being made." Id. at 42 (emphasis added). As the Second Circuit aptly observed in IBM:

46

The trial judge apparently looked upon an interview as the taking of a deposition. In fact, there is little relation between them. A lawyer talks to a witness to ascertain what, if any, information the witness may have relevant to his theory of the case, and to explore the witness'[s] knowledge, memory and opinion--frequently in light of information counsel may have developed from other sources. This is part of an attorney's so-called work product.

[Id. at 41.]

The IBM court expressed concern that having all interviews transcribed could interfere with counsel's preparation of the case, in part because "a potential witness, upon reflection, will often change, modify or expand upon his original statement," so a witness understandably might "not wish to have his initial thoughts taken down by a court reporter as if it were sworn testimony in court." Ibid.

These principles are further illustrated in Washington v. State, 856 S.W.2d 184, 186 (Tex. Crim. App. 1993), in which a criminal defense investigator taped a pre-trial interview with one of the State's witnesses. At trial, defense counsel cross-examined the witness on statements he had made during the interview, without relying on or referencing the tape. Id. at 186. Over a defense objection, the trial court allowed the State to hear it and ultimately allowed the recording to be played for the jury and admitted into evidence. Ibid. The Texas appellate court found this was error, holding that "because the interview at issue . . . was

47

conducted to prepare [the defendant's] case for trial, the recording was protected work-product." Id. at 189.

Applying the unifying principles from these cases and court rules, we conclude that certain details and aspects of the recorded Mazraani interview of Cruz indeed fall under the umbrella of protected work product. In particular, the qualitative aspects of such verbatim recording can be especially revealing.

The State argues that Cruz "was free to discuss the entirety of his conversation with Mr. Mazraani with State investigators[,] regardless of whether the conversation was recorded[,] as he is a State's witness who agreed to speak to defense counsel at counsel's request." Both the State and the Attorney General assert that Cruz could have reported "verbatim" to the detectives everything that was said at the Mazraani interview. This argument fails to persuade us for several reasons.

First, as the ACDL-NJ correctly points out, any after-the-fact account given by Cruz "would not have been verbatim." Very few witnesses would be able to recall an interview with the detail even approaching a verbatim recording. As a practical matter, if a witness simply reports back to detectives about what took place in an interview, the State will normally obtain only a generalized overview, rather than the precise questions posed and answers supplied. The unlimited ability of the prosecutor to play back the verbatim

48

recording – repeatedly – also is a vast improvement over notating a witness's mere recollection of what was asked and said.

For instance, if the witness had experienced difficulty recalling information or expressing himself with clarity during the defense interview, he would be unlikely to volunteer such problems to the prosecutor's office. An astute defense attorney would surely take note of the witness's memory lapses or communication problems as potential fodder for cross-examination at trial. Those first-hand subjective impressions by the defense attorney comprise work product.

Second, there are striking qualitative differences between a witness interview that is contemporaneously recorded, as opposed to an after-the-fact debriefing. The witness's awareness that government agents may be listening to the interview at that very moment could easily have a chilling effect on the witness. The witness may be afraid that his or her taped performance during the interview will be evaluated by the prosecutor's office, and that he or she might forfeit sentencing benefits if he or she does something to displease the prosecutor. This "observer effect" might cause the witness to be less open and forthcoming with the defense lawyer.

Third, a taped recording of the interviews could reveal the tenor of the discussion – and the witness's rapport with defense counsel – much more vividly

49

than could be discerned through an after-the-fact debriefing. For instance, prosecutors could learn from the recording whether the witness spoke in a friendly tone with defense counsel, whether he answered questions promptly and cooperatively without pausing or hesitating, and if he exhibited any empathy for the defense attorney's client. These intangibles about a witness can be of great tactical value to an experienced trial attorney.

<u>At Least Some Work Product Was Revealed Here</u>

We have listened to the recording of the interview and closely reviewed the transcript of it. As we have already noted, no bribe was offered or suggested by Mazraani during the interview. The recording also does not contain any explicit recitation by Mazraani of his intended strategy at trial.

Nevertheless, the recording does clearly reveal to the prosecution several facets of work product. They include, among other things, the precise questions Mazraani posed to Cruz (and what counsel did not ask about), the subjects on which Cruz might have appeared forgetful or less forthcoming, Cruz's apparent views about the case and the parties, his rapport with defense counsel, and other insights. These revelations have the capacity to give the prosecutor an unfair advantage at the narcotics trial. The defense attorney's interview may as well have been conducted with the narcotics prosecutor hiding in the closet.

If the roles were reversed and the defense had surreptitiously recorded a

50

prosecutor's pretrial interview of an anticipated trial witness, the State would surely be sounding the alarm, and contending its work product had been unfairly obtained. Both sides of a case plainly can be prejudiced by such secret taping.

In sum, we agree with the trial court the taping in this case revealed a degree of work product, the actual extent of which is not yet fully known.

IV.

(Ethical Rules Addressing Clandestine Recording By Attorneys and the
Special Duties of Prosecutors)

We next consider the guidance of legal ethics rules and principles. Those authorities do not specifically address the propriety of prosecutors using informants to surreptitiously record witness interviews by opposing defense attorneys. However, they contain a number of important general ethical principles worth mentioning.

ABA Opinion 337

The question of whether it is inherently unethical for an attorney to record any conversation without the knowledge of all parties has been addressed many times, and has evolved over the years. In 1974, the Committee on Professional Responsibility ("Committee") of the American Bar Association ("ABA") issued a formal ethics opinion addressing the propriety of an attorney making a surreptitious recording of a conversation. ABA Committee on Professional Responsibility, Formal Opinions, No. 337 (1974) ("Opinion 337"). Opinion 337

51

"is the genesis of the tape recording issue as far as ethics opinions are concerned." <u>Ward v. Maritz, Inc.</u>, 156 F.R.D. 592, 597 (D.N.J. 1994).

Opinion 337 determined that, except in certain "extraordinary" circumstances, "no lawyer should record any conversation whether by tapes or other electronic device, without the consent or prior knowledge of all parties to the conversation." Opinion 337. The Committee noted that an informal opinion, issued in 1967, had already concluded that a lawyer could not ethically make a surreptitious recording of his or her own conversation with an attorney for the opposing party. <u>Ibid.</u> The Committee opined that the proscription "clearly encompasses the making of recordings without the consent of <u>all</u> parties." (Emphasis added).

Opinion 337 recognized that an exception to the prohibition on surreptitious recording by an attorney could apply in some investigative contexts, stating that "[t]here may be extraordinary circumstances" where attorneys in law enforcement "might ethically make and use secret recordings if acting within strict statutory limitations conforming to constitutional requirements." The Opinion recommended that any such exceptions be examined on a case-by-case basis.

<u>ABA Formal Opinion 01-422</u>

The ABA reversed the broad proscription of Opinion 337 in June 2001.

A-3479-18T4

In Formal Opinion 01-422, the ABA's Standing Committee on Ethics and Professional Responsibility opined that "the mere act of secretly but lawfully recording a conversation" was not "inherently" deceitful, but was improper "only where it is accompanied by other circumstances that make it unethical." As examples, Formal Opinion 01-422 stated that attorneys could not (1) surreptitiously record conversations in those jurisdictions where the law requires the consent of all parties, or (2) lie if asked or do anything to indicate that no recording was being made.

Most states that have addressed the issue since 2001 have followed the rationale and conclusion in Formal Opinion 01-422 and allowed secret recording by attorneys in some circumstances. <u>See</u> Charles Doyle, <u>Wiretapping, Tape Recorders, and Legal Ethics: An Overview of Questions Posed by Attorney Involvement in Secretly Recording Conversation</u>, pp. 4-7 (Congressional Research Service Aug. 9, 2012) (summarizing state ethics opinions on clandestine recordings by attorneys in light of Formal Opinion 01-422), http://www.fas.org/sgp/crs/misc/R42650.pdf. However, some states have not revisited the issue since adopting Opinion 337. Others have not addressed the issue at all. <u>Ibid.</u>

Assuming that our state would also follow the conclusion reached by Formal Opinion 01-422 – that an attorney's clandestine recording only raises an

53

ethical issue if it is accompanied by other dishonest or unethical behavior – then a prosecutor's consensual intercept of defense counsel would not, without more, be inherently unethical. As we will discuss, infra, the main problem here is an operational one, stemming from the prosecutor's failure to screen the personnel handling the narcotics case from the wiretapped recording made for the attorney misconduct investigation.

The New Jersey RPCs

The ADCL-NJ and the Public Defender contend that, by surreptitiously recording the Mazraani interview, the prosecutor violated several New Jersey Rules of Professional Conduct (the "RPCs"). The ADCL-NJ asserts that the prosecutor's conduct violated RPC 3.4 (fairness to opposing party and counsel), RPC 4.4 (methods of obtaining evidence that violate the legal rights of a third person), and RPC 8.4(d) (conduct that is prejudicial to the administration of justice). Further, the Public Defender argues that "there is at least a prima facie case that the Assistant Prosecutor violated Rules of Professional Conduct 3.4(c) and 4.1." The Attorney General and the State maintain that the prosecutor violated none of these rules and, instead acted properly to pursue a report of anticipated witness bribery.

Special Ethical Restrictions Imposed on Prosecutors

The parties have also cited a few general ethics principles that are unique

54

to prosecutors. We briefly canvass those instructive principles and associated case law.

"[T]he primary duty of a prosecutor is not to obtain convictions but to see that justice is done." State v. Timmendequas, 161 N.J. 515, 587 (1999) (citing State v. Ramseur, 106 N.J. 123, 320 (1987)). In furtherance of that principle, the ABA promulgates "Criminal Justice Standards for the Prosecution Function," which are "intended to provide guidance for the professional conduct and performance of prosecutors" ("the ABA Prosecution Standards"). ABA Criminal Justice Standards for the Prosecution Function § 3-1.1(a), (b) (4th ed. 2015).[16] These standards "are aspirational or describe 'best practices,' and are not intended to serve as the basis for the imposition of professional discipline, to create substantive or procedural rights for accused or convicted persons, to create a standard of care for civil liability, or to serve as a predicate for a motion to suppress evidence or dismiss a charge." Id. at § 3-1.1(b).

The ABA Prosecution Standards declare that "[t]he primary duty of the prosecutor is to seek justice within the bounds of the law, not merely to convict," and they reflect general principles for prosecutorial conduct, including in part that the prosecutor "should" (1) "respect the constitutional and legal rights of all

---

[16] The ABA Prosecution Standards are available at:
https://www.americanbar.org/groups/criminal_justice/standards/ProsecutionFunctionFourthEdition-TableofContents/

persons, including suspects and defendants," and (2) "know and abide by the standards of professional conduct as expressed in applicable law and ethical codes and opinions in the applicable jurisdiction." Id. at § 3-1.2(b) to (f).

With respect to the prosecutorial relationship with victims and witnesses, the ABA Prosecution Standards prescribe that a prosecutor "should not act to intimidate or unduly influence any witness," and "should not . . . use methods of obtaining evidence that violate legal rights." Id. at § 3-3.4(b) to (d). As may be pertinent to the State's monetary payment in this case to Cruz, a prosecutor is "permitted to compensate a witness for reasonable expenses" so long as "[a]ll benefits provided" are "documented and disclosed to the defense." Id. at § 3-3.4(e) (emphasis added).

Mirroring the principles established by Gregory and its progeny, the ABA Prosecution Standards instruct that a prosecutor should not "discourage or obstruct communication between witnesses and the defense counsel." Nor should prosecutors "advise any person, or cause any person to be advised, to decline to provide defense counsel with information which such person has a right to give." Id. at § 3-3.4(h).

The ABA further advises that "prosecutors should be familiar with and follow Standards on Prosecutorial Investigations" ("the ABA Investigation

56

Standards"). Id. at § 3-4.1(a).[17] Among other things, the ABA Investigation Standards instruct that: "[w]hen deciding whether to initiate or continue an investigation, the prosecutor should not be influenced by: (i) partisan or other improper political or personal considerations . . . ; or (ii) hostility or personal animus towards a potential subject." Id. at § 2.1(d). The ABA Investigation Standards list eleven factors prosecutors should consider in evaluating investigatory techniques. They include, for example, "whether the investigative means and resources to be utilized are appropriate to the seriousness of the offense . . . ; means of avoiding unnecessary intrusions or invasions into personal privacy . . . ; interference with privileged or confidential communication . . . ; [and] interference with or intrusion upon constitutionally protected rights." Id. at § 2.2(c).

The Need for "Fire-walls" or "Taint Teams"

The most relevant portion of the ABA Investigation Standards to the present case is entitled "PROSECUTOR'S ROLE IN ADDRESSING

---

[17] The ABA Investigation Standards, like the ABA Prosecution Standards, "are not intended to serve as the basis for the imposition of professional discipline, nor to create substantive or procedural rights for accused or convicted persons regarding the prosecutor." American Bar Association, "ABA Standards for Criminal Justice: Prosecutorial Investigations" § 1.1(b) (3d ed. 2014). The Investigation standard are available at: https://www.americanbar.org/groups/criminal_justice/publications/criminal_justice_section_archive/crimjust_standards_pinvestigate/.

A-3479-18T4

SUSPECTED MISCONDUCT BY DEFENSE COUNSEL."   Id. at § 3.3.

Among other things, these standards prescribe in subsection (f):

> (f) The prosecutor's office should take reasonable steps to assure the independence of any investigation of a defense counsel [suspected of wrongdoing] including, if appropriate, the appointment of a pro tem or special prosecutor or use of a "fire-wall" within the prosecutor's office.  At a minimum, an investigation of defense counsel's conduct should be conducted by a prosecutor who has not been involved in the initial matter or in ongoing matters with that defense counsel.
>
> [(Emphasis added).]

As we will discuss, infra, the failure in this case to establish and maintain such a "fire-wall" or "taint team" within the prosecutor's office was a critical omission that requires remedial action.

Summary

The overall thrust of these ethical standards is that prosecutors should exercise caution when using surreptitious means to investigate defense attorneys.  They must take care to balance legitimate investigative needs against concerns of privacy violation, the potential for harassment and abuse, and the need to keep an investigation of potential attorney misconduct wholly separate from the underlying prosecution(s) being defended by that attorney.

We make no determination as to whether the prosecutor's office in this novel situation violated any ethical standards, and there is no ethical ruling by

the trial court for us to review. What we can say is that the general principles underlying the ethical standards reinforce our concerns about the alleged interference with defendant's constitutional rights of fair access to a witness. They also punctuate our concerns about the revelation of attorney work product to the prosecutorial employees involved in the underlying narcotics case.

V.

(Implications and Remedies)

Having detailed the known facts and various guiding principles, we proceed to address their implications. The following aspects of the record are most critical to our assessment:

- In compliance with the Wiretap Act, an assistant county prosecutor authorized the consensual intercept of defense counsel's interview of Cruz, a paid confidential informant.

- Cruz wore two body wires during his interview with defense counsel, devices which recorded and apparently transmitted the interview simultaneously to prosecutorial agents.

- The interview was transcribed, and the rough transcript and the recording were not turned over to defense counsel until three days before trial, by the assistant prosecutor handling the Martinez narcotics case.

- The recorded interview revealed, at least to some extent not yet fully uncovered, the defense counsel's work product, which could be

59

advantageous to the prosecutors handling the narcotics case.

- One or more detectives in the prosecutor's office took part in both the investigation of alleged attorney misconduct and the narcotics case, without the office maintaining ethical screens preventing such dual involvement.

- The assistant prosecutor handling the <u>Martinez</u> case was evidently exposed to the contents of the consensual intercept, and he was not screened from that material.

- The trial court found that because some amount of work product was divulged, the appropriate remedy was to disallow the prosecutor from affirmatively placing into the evidence the contents of the Mazraani interview, although defendant was free to use the interview contents if he so desired.

- The trial court denied defendant's requests for more stringent remedies, such as dismissal of the indictment or preclusion of trial testimony by Cruz in the State's case.

We conclude from these circumstances that the joint involvement of prosecutorial representatives in both the confidential intercept conducted in the attorney misconduct investigation and in the narcotics case, coupled with the disclosure to the <u>Martinez</u> assistant prosecutor of Cruz's recorded interview, infringed upon defendant's constitutional rights.

The attorney work product divulged from that interview through the recording should not have been revealed to the persons in the prosecutor's office

60

who were involved in the <u>Martinez</u> case. Instead, the recording and the transcript of it should only have been made known to and used by appropriately-screened staff members who had no involvement in the narcotics case. Once Cruz reported that he might be offered a bribe at the upcoming interview, the prosecutor's office should have used an independent team to take over the recording process. That internal screening was not done here, and its omission requires a remedy.

Our Supreme Court in <u>Sugar</u>, 84 N.J. at 1, pondered the appropriate remedy to impose when inappropriate prosecutorial conduct occurs in the course of an investigation. In <u>Sugar</u>, law enforcement officers unlawfully eavesdropped on confidential conversations between a criminal defendant and his attorney. The Court concluded that the circumstances did not call for the "drastic remedy" of the dismissal of the indictment. <u>Id.</u> at 22. However, the Court held that other measures were necessary to eliminate the taint caused by the improper actions. In particular, the Court required the State to assure that the witnesses and evidence it intended to present at trial, through a different team of prosecutors and staff who had not been involved in the eavesdropping, would be untainted. <u>Id.</u> at 26-27.

The Court's decision in <u>Sugar</u> signifies that if either the attorney-client or work product privilege has been invaded by a prosecutor, the extreme remedy

61

of the dismissal of an indictment is appropriate only where no lesser remedy could fully address the harm. The Court in Sugar considered a blatant and unconstitutional intrusion into a privileged arena, yet it was willing to entertain the possibility that a less severe remedy than dismissal could be achieved. Id. at 21, 22-24 (noting that "dismissal of a prosecution is the appropriate remedy for official intrusion upon attorney-client relationships only where it destroys that relationship or reveals defendant's trial strategy").[18]

Similarly, the Court in Williams, when faced with the improper, forced disclosure of work product to the State and the jury, ordered the remedy of a new trial rather than dismissal of the indictment. Williams, 80 N.J. at 479. The State's improper acquisition of work product does not, by itself, make a fair trial impossible and require dismissal. It is well-established that dismissing an indictment is a "draconian remedy" and a "last resort because the public interest, the rights of victims and the integrity of the criminal justice system are at stake." State v. Ruffin, 371 N.J. Super. 371, 384 (App. Div. 2004) (citation omitted).

Defendant cites to United States v. Levy, 577 F.2d 200, 202 (3d Cir. 1978), for the proposition that dismissal is the sole appropriate remedy in circumstances where any defense strategy has been disclosed to the government,

---

[18] Later, in "Sugar II," State v. Sugar, 100 N.J. 214, 226-28 (1985), the Court reiterated that witnesses might be tainted and thus disqualified from testifying.

because it would be too difficult for courts to "arrive at a certain conclusion as to how the government's knowledge of any part of the defense strategy might benefit the government." The <u>Levy</u> court's holding is not as broad as defendant suggests.

In <u>Levy</u>, a government informant was represented by the same attorney as the defendant, and the informant became privy to attorney-client-privileged communications revealing that "the defense strategy would be to concentrate on the credibility of two key government witnesses." <u>Id.</u> at 204. Government representatives actively solicited this privileged information from the informant, and the prosecutor "became privy to this strategy." <u>Id.</u> at 205. In those circumstances, the Third Circuit Court of Appeals held that "the only appropriate remedy" was dismissing the indictment.

Unlike in <u>Levy</u>, the acquisition of work product in the present case was not through a knowing intrusion by the government into attorney-client privileged communications where defense strategy had been expressly discussed. To be sure, as we have already explained, the fact that this was a witness interview rather than a confidential client meeting does not remove the setting entirely from the realm of work product protection. However, the imbedded trial strategy a prosecutor can obtain from eavesdropping on a defense interview of a third party witness is not as extreme as what can be learned from

63

monitoring a confidential discussion between a lawyer and a client.

Case law addressing unconstitutional interference with a defendant's right of free access to witnesses teaches us that a remedy should be crafted to fit the harm caused. The situation does not always require dismissal of the case.[19]

We accordingly affirm the trial court's denial of defendant's motion to dismiss the indictment. However, given the improper disclosure of attorney work product that unfortunately has occurred, we find it necessary to strengthen the mild remedy the court imposed.

We discern the harm caused to defendant in this case has at least two dimensions. First, by intruding into defense counsel's work product, prosecutors appear to have gained information and insights they could use to better prepare

---

[19] For example, in United States v. Ebrahimi, 137 F. Supp. 3d 886, 889 (E.D. Va. 2015), where the government advised people to report any contact by defense counsel and to have a government representative present at any interview, the court ordered that a detailed letter from the judge be provided to the potential witnesses, informing them that "as a witness, you are equally available to lawyers for the defense and the Government at your own discretion." The letter further stated that the government's requests were "not in keeping" with this principle, and that the witnesses had the option to agree or decline any interview and were "not required to have a Government agent present at your interview, if you decide to consent to an interview." Id. at 889-90. See also, e.g., Kines v. Butterworth, 669 F.2d 6, 10 (1st Cir. 1981) (in which witnesses who had been instructed not to speak with defense counsel were advised "on the judge's authority, of their right to talk to defense counsel 'as they wish or not wish'"); Peter Kiewit Sons' Co., 655 F. Supp. at 78 (ordering a remedy allowing the defense to depose witnesses "in a neutral atmosphere," to which the parties did not object).

A-3479-18T4

Cruz as a witness and to counter the defense. Second, the State's conduct created a potential conflict of interest between defendant and Mazraani. That conflict may compel defendant to retain new counsel, to the possible detriment of his defense and his finances.

The State argues the trial court has already given defendant a sufficient remedy, contending that "barring the State from introducing any evidence of the recorded conversation" at defendant's trial effectively "ensure[d] that defendant would be insulated from any harm." Similarly, the Attorney General contends that "defendant cannot even claim prejudice because the State will not be introducing the lawful consensual recording at defendant's trial."

However, simply precluding the State from using evidence that it does not want to use – and likely would not be admissible in the State's case in any event – does not remediate the harm to defendant. As aptly noted by the Public Defender, the remedy provided by the court "does not address the State's improper conduct and, practically, serves only to encourage such misconduct in the future."

The Public Defender proposes that, if this court concludes that dismissal of the indictment is not warranted, then, alternatively, the Middlesex County Prosecutor's Office should be disqualified from continuing to handle this narcotics case. Similarly, the ACDL-NJ contends that the prosecution "would

65

have done well to implement" a "taint team."

In its brief on appeal, the State advises that it would accept, as an alternative remedy to any finding of impropriety, the designation of "an independent assistant prosecutor, unfamiliar with the exchange between Mr. Mazraani and [Cruz] and not privy to any possible trial strategy that might have been disclosed, handle defendant's matter." We adopt such a remedy, with modification.

Specifically, this matter is remanded to the trial court on the condition that, within forty-five days, the Attorney General either supersede the indictment, to be handled exclusively by untainted attorneys and staff within the Attorney General's Division of Criminal Justice, or refer the matter to a different county prosecutor's office for handling by an untainted team. The Middlesex County Prosecutor's Office shall immediately cease any further involvement in prosecuting, investigating, or otherwise participating in this case.

This remedy of transferring defendant's case to a prosecutorial team that has not been exposed to the recording and transcript of the Mazraani interview removes the possibility that information gleaned from such a review could be used to better prepare the State's case.

Due to the limitations of the existing record, we decline to go further and resolve whether, as defendant requests, the State also should be barred from

calling Cruz as a witness at trial as a prophylactic measure. Among other things, the record does not fully reveal what discussions actually transpired between prosecutor's office attorneys and detectives and Cruz before he agreed to wear the body wires. As we have already noted, we do not know, for example, if Cruz expressed any reluctance to wear the devices, whether the $180 payment influenced his decision, and how that sum was calculated. We cannot determine whether the prosecutorial team violated the principles of Blazas, 432 N.J. Super. at 343 by substantially interfering with Cruz's independent decision to proceed with the interview or choice to wear recording devices. We also cannot tell what, if any, instructions Cruz was given before the interview. Further, it is unclear, apart from the short transcribed March 14 discussion with the detectives, whether Cruz had had any other relevant post-interview discussions with prosecutorial representatives that might shed further light on how Cruz's services were used.

The record also does not reveal the extent to which the Sergeant who led the narcotics investigation, or any other potential witnesses for the prosecution, might have been tainted by their involvement in or exposure to the covert recording or transcript. Through such involvement or exposure, such witnesses might now be privy to defense counsel's work product to a degree that might be fundamentally unfair to defendant at trial. Depending upon the record

67

developed on these matters, the trial court should consider whether the Sergeant or any other anticipated State witnesses are impermissibly tainted to require their exclusion at trial. Alternatively, whether or not sufficient taint exists, the trial court shall consider whether other prophylactic remedies concerning such witnesses are appropriate. At the very least, defendant is entitled to discovery of a fuller record of the witness interactions, and an opportunity to use such information as impeachment material on cross-examination a trial.

The shortcomings of the record in this regard are not the fault of the defendant, given the abrupt notice he received of the recording's existence on the brink of trial, and the trial court's denial of his ensuing request for discovery. A remand to develop the record more fully on these remedial questions is consistent with our approach in Blazas, 432 N.J. Super. at 345-46.

Consequently, we remand to the trial court for a plenary hearing the question of whether Cruz or any other persons should be barred as a trial witness for the State. At that hearing, testimony may be elicited from Cruz and representatives of the Middlesex County Prosecutor's Office who interacted with him. Defendant shall have a burden of establishing a prima facie basis showing that Cruz was unfairly influenced or utilized to an extent that could warrant the prophylactic remedy of his testimonial exclusion. Similarly, if he seeks to bar other witnesses, defendant has a prima facie burden to show that any witnesses

68

are tainted by their involvement in or exposure to the covert recordings, or whether their testimony otherwise should be barred as a remedial measure. If he meets that burden, the burden would then be shifted to the State to demonstrate beyond a reasonable doubt that no such improper interference or witness taint exists, and that the prosecution may continue without any adverse effect upon defendant arising out of the circumstances. Sugar, 84 N.J. at 24-25.

Depending on the facts elicited in the remand hearing, the trial court is authorized as a remedy to bar the State from calling Cruz or a tainted witness at trial. The State would then need to decide if it wished to pursue the case at trial through other unaffected proofs, if possible.

VI.

(Conclusion)

In concluding, we stress that nothing in this opinion is intended to deprive law enforcement of appropriate tools to investigate attorney wrongdoing. Indeed, as the result of the State's investigation, a grand jury has charged an attorney – but not Martinez's counsel – with criminal acts of witness tampering, albeit for acts unrelated to the present narcotics case. That indicted attorney surely deserves, like any other citizen, the presumption of innocence. But if those charges are ultimately proven, the verdict will illustrate the importance of

69

law enforcement's role in rooting out conduct that undermines the integrity of our system of justice.

Even so, the prosecutor's investigatory role is not unfettered. Heightened caution must be observed when the government seeks to intrude surreptitiously into a defense attorney's discharge of professional obligations when he or she conducts witness interviews in preparation for trial. The Sixth Amendment of the Constitution, and our State Constitution, as well as principles of legal ethics, demand that heightened caution.

Although, in authorized instances, relevance-based government surveillance of attorney interviews of witnesses is permissible, appropriate safeguards must be followed to protect the attorney's work product and fair access to witnesses. We respectfully urge the Attorney General to promulgate guidelines that address these concerns. Counsel have submitted prospective suggestions for such guidelines in their supplemental post-argument briefs. Although we do not endorse or reject them, they may prove useful for the Attorney General's consideration.

Affirmed in part, modified in part, and remanded in part. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

70